[S. F. No. 15627. In Bank.—August 31, 1936.]

CITY OF DUNSMUIR (a Municipal Corporation), Petitioner, v. C. O. PORTER, as City Treasurer, etc., Respondent.

Henry McGuinness, City Attorney, and H. A. Postle-thwaite for Petitioner.

Samuel W. Gardiner for Respondent.

CURTIS, J.—In this proceeding the City of Dunsmuir, a city of the sixth class, seeks to compel by writ of mandate its treasurer, the respondent herein, to sign certain bonds, issued by said City of Dunsmuir in pursuance of an act of the legislature of this state (Stats. 1909, p. 1096), as amended by chapter 774 of the Statutes of 1935. (Stats. 1935, p. 2163.) The 1909 act has never, so far as we are advised, been before any of the appellate courts of this state. The 1935 act so amends the earlier act that there is nothing of substance left in the earlier act that is not completely covered by the more recent legislation. It will not be necessary therefore for us to make any further reference to the 1909 act. We will, therefore, confine our discussion to chapter 774 of the 1935 Statutes (Stats. 1935, p. 2163), which, for the sake of brevity, we will refer to as the 1935 act or statute.

The first section of this act merely changes the title of the act. The second section is as follows: "Every municipal corporation in the State of California may incur a bonded indebtedness to acquire any bonds issued by such municipality, or by or for any district therein, or bonds issued for street work or other public improvements, in the municipal corporation under any act of the Legislature providing for the performance of street work or other public improvements, or the issuance of bonds to represent or be secured by assessments levied for such work or improvements, including any bonds issued under the Improvement Bond Act of 1915 and the Acquisition and Improvement Act of 1925. It is the intent of this act that investments of such fund shall be for the purpose of aiding and facilitating the making of needed public improvements in the municipality or for the purpose of limiting or preventing such increasing of district taxes or assessments as might lessen or impair the general tax revenues of the municipality from any district or districts or for the purpose of providing means whereby district indebtedness or assessments represented by or securing bonds may be reduced."

The third section of the act provides that the bonds authorized to be issued under the provisions of said act shall issue, except in certain respects not material to any question, in the manner provided for by chapter 32 of the

Statutes of 1901. (Stats. 1901, p. 27.) This section further provides that, "If the bonds are to be issued to acquire outstanding bonds, the ordinance calling the election shall briefly and generally state what bonds are to be purchased or acquired, the total principal amount thereof and the maximum purchase price proposed to be paid therefor, and the maximum purchase price so stated shall not be exceeded in the purchase of such bonds. The bonds issued under this act may be sold at not less than the par value thereof or may be exchanged at their par value for the outstanding bonds; provided the outstanding bonds are taken in such exchange at a price not exceeding the maximum purchase price stated in the ordinance calling the election. Such bonds, when issued, shall be redeemed and paid as provided in said act of 1901, and the taxes for the payment thereof shall be levied as provided in said act; provided, however, that where any issue of bonds under this act is to mature at one time the amount of the taxes to be levied annually shall be as provided in section 5 of this act."

Section 4 provides for the creation of a "General Improvement Fund" in which shall be kept all funds arising from the sale of bonds issued in pursuance of said act, "and to invest and reinvest the same in bonds issued by said municipality, or bonds issued for street, sewer, drainage or any other improvements within said municipality, and to collect the principal of and interest on said bonds and credit the same to said fund; provided, however, that if the bonds are issued to acquire or to provide funds for the purchase of certain outstanding bonds, they may be used only for that purpose, and all of said funds not so used and all sums received in payment of principal or interest of the bonds acquired by the city or received from the sale of any thereof (if such bonds are sold by the city as hereinafter provided) shall be used for the payment of the principal and interest of the bonds issued pursuant to this act for the purpose of acquiring such outstanding bonds. Said municipality may sell, at the discretion of its legislative body any of said bonds purchased by it; provided that said bonds shall not be sold at a price less than the price paid therefor. The purchase price of any bonds so sold together with the accrued interest thereon shall be placed in said general improvement fund and may be reinvested in

bonds, or, where under the provisions hereinbefore in this section contained such reinvestment is not permitted, shall be used to pay principal and interest of the bonds issued under this act for the purpose of acquiring the bonds so sold.''

We set forth section 5 in full as follows: ''During the time the municipality owns any district bonds payable from taxes or assessments levied wholly or partially in accordance with the assessed value of the land within the district the legislative body may, in its discretion, which may be exercised each year, omit from the amount of the annual tax or assessment to be levied for the payment of principal and interest of such bonds any sum for the payment of principal and interest past due and unpaid because of delinquencies, and may limit or omit any sum for anticipated delinquencies. The tax or assessment shall be levied in accordance with the statute under which the bonds acquired were issued, but the total amount of any annual levy may be limited as provided herein.

''Where any bonds acquired pursuant to the provisions of this act are acquired at less than the par value thereof, the legislative body may, in its discretion, reduce the total principal amount of any issue of bonds so acquired and held by it to a total principal amount which it may fix by ordinance; provided such reduced total principal amount of any issue shall not be less at par than the total purchase price of the total principal amount of the bonds of such issue acquired by said legislative body. The ordinance shall designate the issue of bonds to be so reduced, the total principal amount of the bonds of such issue acquired, the purchase price therefor, the principal amount of the proposed reduction, the numbers, denominations and maturity dates of the bonds to be canceled and the time and place of the proposed cancellation. Such ordinance shall be subject to referendum as are other ordinances of the city. At the time and place fixed, unless prevented by referendum, the bonds shall be publicly canceled and the city clerk shall enter on the minutes of the legislative body a record of the bonds canceled sufficient to identify the same and the fact and date of the cancellation thereof. If the bonds canceled are issued under the Improvement Bond Act of 1913 the legislative body shall reduce the principal amount

of the assessments securing such bonds to the total principal amount of the unpaid and uncanceled bonds of the same issue. Such reduction of assessments shall be carried out by canceling such proportion of the assessments as may be necessary therefor and the legislative body is empowered to provide procedure for such cancellation in compliance with constitutional requirements. The uncanceled portion of the assessments shall be valid and collected in accordance with the terms of the statutes under which the original assessments were levied and bonds issued."

The balance of the act consisting of sections 6 and 7 relates to the mode and manner of payment of bonds issued in pursuance of the provisions of said act, and are in no way involved in any question arising in the present proceeding.

On and prior to the eighth day of October, 1935, there were outstanding four bond issues against certain improvement districts within the City of Dunsmuir. The bonds represented therein had been issued in pursuance of the Improvement Bond Act of 1915. (Stats. 1915, p. 1441.) The principal of these four bond issues on October 8, 1935, amounted to $305,828.06, of which the sum of $87;645.27 was due and delinquent, and there was also due, unpaid, and delinquent, approximately the sum of $64,223.88 interest, making a total default of principal and interest of $151,969.15.

On October 8, 1935, the City of Dunsmuir instituted proceedings under the act of 1935 to issue bonds in the amount of $152,919 for the object and purpose of acquiring a general improvement fund to be used for the purpose of acquiring the outstanding special assessment bonds issued by the improvement districts within said city just referred to.

It will be noted that the principal sum of said proposed bond issue is substantially one-half of the principal of said four outstanding bond issues. In pursuance of said proceedings, an election was held in said city at which the question as to whether said city should incur said indebtedness was submitted to the qualified electors of said city, and resulted in an almost unanimous vote in favor of the incurring of said indebtedness. As no question is raised as to the regularity of said proceedings, it will not be necessary to set out the various steps taken by the city council of said

city leading up to the final resolution of said council ordering the issuance of said bonds and the request that respondent sign the bonds issued under said resolution. We will assume that these proceedings were regular in form and that they conformed to all the requirements of the act of 1935, and of the Municipal Bond Act of 1901 (Stats. 1901, p. 27), and acts amendatory thereof. Upon these bonds being presented to respondent as city treasurer of said city for his signature he declined to sign the same, claiming that the act of 1935 was unconstitutional for various reasons which will be hereafter considered in detail. This action was brought to compel the respondent to sign said bonds. This court issued an alternative writ of mandate directed to respondent commanding him to sign said bonds or to show cause why a peremptory writ of mandate should not issue requiring and commanding him to execute and sign said bonds. As a return to said alternative writ, respondent has filed a general demurrer to the petition herein in which he directly alleges that the act of 1935 is unconstitutional. The sole question before us, therefore, is the constitutionality of the act of 1935.

It is first contended by respondent that the statute violates article IV, section 31, of the Constitution of this state which prohibits the gift of public funds for private purpose or to private individuals, in that it permits a gift of public funds to the owners of the improvement bonds. These improvement bonds were issued under the Improvement Bond Act of 1915 (Stats. 1915, p. 1441), and by the terms of this act these bonds are secured by a special assessment levied against the property owners of the district in proportion to the benefits received by the improvement constructed therein. They are further secured by a levy of ten cents upon one hundred dollars of assessable property within the city as provided by section 16 of said act. These bonds are not general obligations of the city. (*American Co.* v. *City of Lakeport*, 220 Cal. 548 [32 Pac. (2d) 622].) Respondent accordingly contends that the city by exchanging its general improvement bonds, which are general obligations of the city, for these district improvement bonds, is making a gift of the public funds of the city to the owners of the limited secured improvement bonds. After the city has become the owner of the district improvement bonds, as

to these bonds there is no requirement placed on the city thereafter to make the ten cent levy upon the assessable property of the city. The bonds being the property of the city, the latter may forego any obligation of the city to pay the same or any part thereof, unless there is some express direction to the contrary in the act under which the city acquires them. To relieve the taxpayers of the city of the burden imposed upon them by the Improvement Bond Act of 1915, while said bonds are in private ownership, is an object of considerable consequence to all the taxpayers therein. This obligation may grow to substantial proportions and the tax to meet it may become, and in many instances has become, a heavy burden upon all the property owners of the city. Evidently this is the case in the City of Dunsmuir. To alleviate this condition and to lessen this excessive burden upon the property owners of the city, is undoubtedly a matter of public concern, and any means adopted by the authorities of the city with that object in view would be a distinct public, or municipal purpose. If, in effectuating this purpose, the bondholders or other persons receive some indirect, or even some direct benefit, that fact would not prevent the city from carrying out such public purpose. In *Veterans' Welfare Board* v. *Jordan,* 189 Cal. 124, 146 [208 Pac. 284, 22 A. L. R. 1515], the court said: "In view of the fact that the money raised by the bond issue so far as it is to be applied to the purchase, subdivision, etc., of land under the Veterans' Welfare Act is applied to a public purpose, it follows that the fact that incidentally there is a benefit derived by the purchaser from the credit of the state and that such purchaser is a veteran should not render invalid such legislation. That is to say, where the transaction authorized by statute on its face purports to be a purchase and sale of land and there is no loan of credit in the ordinary acceptation of such terms and where in substance and effect the legislation accomplished a wholly different purpose from the mere extension of credit, the law is not to be held unconstitutional as a violation of the substance and effect of the provision against lending or giving the credit of the state."

From what we have said, we do not wish to be understood as holding that by the terms of the act it necessarily permits any gift of public funds to the bondholders.

The city is not compelled to purchase any of such bonds. It is optional with the city whether it purchases them, or exchanges any of the general improvement bonds for the district improvement bonds. If it makes such purchase or exchange, it must do so in pursuance of the terms fixed by the ordinance calling the election for the issuance of said general improvement bonds. In the present instance, as shown by said ordinance, the city authorities are limited in their purchase of district bonds to practically fifty per cent of their face value exclusive of interest. It is apparent that should the bondholders accede to the present plan of the city to acquire the improvement bonds, they will sustain a most substantial loss on their original investment. Yet, as we have stated, should they be placed in a more advantageous position than that occupied by them at present by a purchase or exchange of their bonds, that circumstance cannot defeat the right of the city to relieve its property owners from the present burden under which they are laboring by reason of the delinquent condition of said improvement districts. Our conclusion therefore is that the act of 1909, as amended in 1935 (Stats. 1935, p. 2163), does not violate this provision of article IV, section 31, of the Constitution of this state.

The further contention of the respondent that the city receives no consideration for the issuance of the general improvement bonds, and for that reason they are not of any binding force against the municipality, is in our opinion without merit. The property owners of the city who alone are liable for the payment of the general improvement bonds, are relieved from the payment of the annual tax of ten cents for each district upon each one hundred dollars of assessable property in the city. The burden of this tax, as we have seen, may become, and in many instances has become, a serious burden upon the taxpayers of the city. The release of property owners from this liability furnishes a sufficient consideration for the issuance of the general improvement bonds.

Section 5 of the 1935 act, as we have seen, from its terms as quoted above, provides, ''where any bonds acquired pursuant to the provisions of this act are acquired at less than the par value thereof, the legislative body may in its discretion, reduce the total principal amount of any

issue of bonds so acquired and held by it to a total principal amount which it may fix by ordinance; provided such reduced total principal amount of any issue shall not be less at par than the total purchase price of the total principal amount of the bonds of such issue acquired by said legislative body". Respondent contends that the contract between the city and the property owner is impaired in that the power given the city under this provision of the act is violative of article IV, section 31, of the Constitution inasmuch as such reduction in the assessment of the property owner constitutes a gift to him to the extent of the reduction in this assessment. It will be noted, however, that the power of the city to make such reduction in the landowner's assessment is limited to the reduced price at which the city purchases the district bonds. Therefore whatever reduction is made in the landholder's assessment is without any cost whatever to the city or to any of its property owners. The city merely passes on to the property owners the reduction which the bondholders make in the price of their bonds. We must assume, as the sale of the bonds by the bondholders is voluntary, that the city gives the full market value of the bonds at the time of their purchase. By the terms of the act, it was empowered to sell the bonds after acquiring them for the amount of the purchase price. No one, we think, would claim, if the city made such a sale of any of said bonds, that it would be making a gift of public property to the purchaser. If, then, the city receives through assessments from the property owners, the purchase price of the bonds, it is in the same position from a financial point of view as if it had sold the bonds to some third person. In either case the city would receive what it paid for the bonds which was their market value, and in neither case would there be a gift of any public funds to a private individual. No taxpayer of the city would be injured by such a transaction. As he sustains no injury by a reduction in the liability of the property owner he has no cause of complaint. (*Lindsay-Strathmore Irr. Dist.* v. *Wutchumna Water Co.*, 111 Cal. App. 688, 696 [296 Pac. 933].)

Neither is the contract of the property owner impaired because he is subject to the additional tax to pay general improvement bonds. This same question was raised and decided in the case of *County of San Diego* v. *Ham-*

*mond,* 6 Cal. (2d) 709 [59 Pac. (2d) 478, 105 A. L. R. 1155], where the court stated, ''The former [assessments to meet the district improvement bonds] only are levied in payment of the improvement, while the latter are levied for general public purposes. In the present instance, by virtue of his ownership of the land within the district, the landowner pays the assessment levied for the purpose of paying for the improvement of his land and with other landowners of the county he will be called upon to pay a tax to meet the refunding bonds as they become due.'' We, therefore, held in that case that as the refunding bonds were issued for a public purpose, the property owner in the district was subject to pay not only the assessment to pay for the improvement of his property, but also as an owner of property in the county the tax to meet the refunding bonds which were issued for another and distinct purpose from that for which the improvement bonds were issued. (*People* v. *Sacramento Drainage Dist.,* 155 Cal. 373, 389 [103 Pac. 207].) There are other circumstances which we should take into account in the case of the present property owners. Under the plan proposed by the City of Dunsmuir, the property owners will undoubtedly be relieved from the liability to pay the ten-cent assessment, and their district assessment will be reduced over fifty per cent. We see no legal or other reason why any landowner should complain of the proposed plan.

It is next contended that this proposed plan, as provided by the 1935 act, will impair the rights of the nonconsenting bondholders, or those bondholders who refuse to sell or exchange their bonds for the general improvement bonds. We find nothing in the act which in any way tends to impair their rights. The present act differs materially from the act which we had under consideration in the case of *County of Los Angeles* v. *Rockhold,* 3 Cal. (2d) 192 [44 Pac. (2d) 340, 100 A. L. R. 149]. Under that act it was made compulsory upon all the bondholders, when seventy-five per cent of their number consented, to accept the refunding bonds in place of the improvement bonds held by them, although the refunding bonds differed both in amount and in the nature of their security from the improvement bonds which they were asked to surrender. We held in that case that the rights of the nonconsenting bondholders

were impaired by being compelled to accept bonds which so vitally differed from those which they surrendered. Under the act of 1935 the city after it has acquired the whole or any portion of a bond issue may make certain concessions enumerated in the act in reference to the bonds so acquired, but no authority is given to make such concessions, or any concessions whatever, respecting district bonds which are in private ownership and which the owners refuse to surrender to the city. No attempt is made by any provision of the act of 1935 to impair the rights of nonconsenting bondholders.

The contention that the act subjects the property of the landowners within the district to double taxation and results in the taking the property of landowners within the city without due process of law is without merit. It is conceded that such is not the case if the purpose for which the general improvement bonds are issued is a public and municipal purpose. Our previous consideration of the public character of that purpose fully answers the contention just mentioned.

The final contention of respondent is that the proceeding will result in a discrimination between the property owner within the district who paid his assessment in cash and those property owners who did not pay their assessment and allowed bonds to issue against their property. The property owner who paid his assessment in full in cash cannot complain that those who allowed bonds to issue were relieved in part of the payment of said bonds unless the former sustained some injury as a result of this alleged discrimination. The first property owner paid what was legally due from him for the improvement of his property. The reduction of the assessment of the property owner who permitted bonds to issue in payment of the improvement of his property, as we have seen, was without cost to the other property owners of the district or even of the city. Whatever reduction was made in said assessment was due to the discount at which the bondholders were willing to sell or exchange their improvement bonds. The property owner who paid his assessment in the first instance, therefore, has no ground for complaint as he suffered no injury as a result of the concession made to the property owner who allowed bonds to issue against his property.

Neither is the property owner who paid his assessment in cash unlawfully discriminated against because beside this original payment he is further required to pay his proportionate share of the general improvement bonds. We have previously held in this case, as we have in other cases, that a tax to meet the general obligations of the city, such as the general improvement bonds, is entirely different and distinct from a tax to meet the original assessment levied for the purpose of paying the original improvement bonds. It is not necessary to repeat what we have already said upon this subject. The property owner who has paid his assessment in cash stands in no different relationship in respect to the liability created by the issuance of the general improvement bonds than any other property owner of the city. As this liability was created for a public purpose all property of the city may be subjected proportionately to its payment. The contention that the property owner who paid his assessment in cash is discriminated against by the terms of the act cannot be sustained.

The foregoing constitute all the grounds advanced by respondent in support of his contention that the 1935 act is unconstitutional. We are satisfied that none of them is tenable in so far as they may be urged against the validity of said act when invoked for the purpose of acquiring district improvement bonds issued under the Improvement Bond Act of 1915. While section 2 of said act purports to empower the municipalities of the state to acquire various classes of bonds our opinion should be limited in its application only to bonds issued under the Improvement Bond Act of 1915. We express no opinion as to the constitutionality of said act in so far as it relates to the acquisition of bonds other than those issued under the Improvement Bond Act of 1915.

The proceedings for the issuance of the bonds which the respondent has refused to sign are conceded to be regular and conform to all the requirements of the 1935 act. It is, therefore, the duty of the respondent to sign said bonds as the treasurer of the City of Dunsmuir.

Let the peremptory writ of mandate issue as prayed for.

Waste, C. J., Langdon, J., Seawell, J., and Shenk, J., concurred.