[Civ. No. 6019.   Third Appellate District.—February 21, 1938.]

CITY OF CRESCENT CITY (a Municipal Corporation), Petitioner, v. J. J. MORAN, as Treasurer, etc., Respondent.

The facts are stated in the opinion of the court.

Chickering & Gregory for Petitioner.

Taylor F. Peterson for Respondent.

PLUMMER, J.—For the purposes of convenience the petitioner hereafter will be referred to as "City".

This cause is before us upon an application of the city to compel J. J. Moran, as Treasurer of the City of Crescent City to sign certain bonds in the sum of $175,000 voted by the people of said city on September 28, 1937. The purposes for which said bonds were voted were set forth upon the ballot, and are in substance as follows:

"Shall the City of Crescent City incur a bonded indebtedness of $175,000.00 for the purpose of purchasing at a discount the bonds and unpaid coupons thereon, of Acquisition and Improvement District No. 1 and Acquisition and Improvement District No. 2, as specified in a resolution passed and adopted by the City Council of the City of Crescent City on the 26th day of July, 1937."

The record shows that at the election held pursuant to the resolution of the city council of the city, the propositions submitted by the resolution of the city council were approved by the voters of said city by the following vote: 625 in favor of the proposition submitted, and 85 in opposition thereto.

The respondent declines to sign the bonds referred to, basing his opposition thereto on the alleged ground that the act of the legislature known as "Chapter 494, approved June 21, 1937, Statutes of 1937, page 1468", is unconstitutional. The signing of the bonds on the part of the respondent being purely ministerial, if the act in question is found to be constitutional a writ of mandate should issue.

Section 1 of the act of the legislature, *supra*, provides that in all cases where bonds have been issued under the provisions of the Acquisition and Improvement Act of 1925, and amendments thereof for the payment of the costs of any public improvement made, etc., within the territorial limits of any city, the city council shall have the right and the power to purchase or redeem at a discount such bonds and interest coupons thereon. The purchase of the bonds and coupons

may be carried out upon such terms and in such manner as the city council may deem most convenient, etc.

Section 2 of the act, authorizes such city to contribute such amount of money to the interest and sinking fund of such district or districts as, in the judgment of said city council should be transferred to accomplish the purposes and objects of this act.

Section 3 authorizes the levying of a tax to provide for carrying out the purposes of the act; also provides for the issuance of bonds under and in accordance with the law relating to the issuance of bonds by cities, subject to the provisions of section 20 of article XI of the state Constitution; provides for the calling of an election for the issuance of bonds by the city, and the manner of submitting the question of the issuance of bonds to the voters of the city.

Section 4 provides for the passing of resolutions by the city council by a four-fifths vote thereof, declaring that to be for the convenience and necessity of the city and the interest of the city will be served and promoted by the expenditure by said city for the purposes set forth in the act.

Section 5 provides that bonds and coupons may be purchased or redeemed at a price not exceeding 80 per cent of the face value thereof.

Passing to section 7 of the act we find the purposes stated in the following language:

"The purpose of this Act is to provide a complete scheme whereby any financially distressed and delinquent or insolvent district or districts created under the provisions of the Acquisition and Improvement Act of 1925, and amendments thereof, may be refunded or the bonded indebtedness thereof adjusted with the financial aid of the City in which the same may be situated, and without the necessity or expense of destroying the structure or operation of said district, and without issuing refunding bonds or reassessing the same under any assessment refunding statute."

No question being raised as to the regularity of the preliminary proceedings leading up to the issuance of the bonds, we can pass to the question of the constitutionality of the statute authorizing cities to issue bonds for the purposes therein mentioned.

The record before us shows that the two districts mentioned comprise practically all of the territory within the

limits of the city; that while the two districts were formed, the work for which the bonds of the districts were issued was of a public nature, and was essentially for the benefit of the entire city, and not particularly for the benefit of the residents of the particular districts.

Some ten or twelve years ago the city undertook a program of public improvements, including the paving of streets, construction of curbs and sidewalks, incurring an expenditure of approximately $265,000. For the payment of this work special assessment districts were formed, and bonds were issued under the Acquisition and Improvement Act of 1925, payable from special assessments against the properties in the respective districts. These assessments have proven so heavy that a large number of the taxpayers appear to have been unable to pay the assessments and the taxes for other purposes levied upon the lands of the district, so that on or about the first of the year of 1937, both of the districts were in default in the payment of principal and interest to the extent of about 35 per cent, that portion of the property lying within the respective districts being allowed to go delinquent. The problem of the city has become acute, due to the fact that the two assessment districts, comprising substantially all of the property within the corporate limits of the city, causes a corresponding delinquency in the tax rolls of the city, leaving the city in a serious condition as to being able to raise sufficient funds to carry on the purposes for which the city was incorporated, including the expenses ordinarily necessary to be incurred by an incorporated city. These particular purposes we need not specify.

Unless restrained by some provision of the state Constitution, it would appear that the legislature has plenary power in relation to the subject of taxation. This rule is clearly stated in 24 California Jurisprudence, page 44, section 27, as follows: "The Constitution, so far as it deals with the subject of taxation, is not a grant of, but a limitation upon the power of the legislature, and that body has the entire control and management of the fiscal affairs of the State, having plenary and unlimited power respecting the subject of taxation, except as restricted by the Constitution itself." This rule is set forth in *In re Higgins*, 50 Cal. App. 533 [195 Pac. 740], in these words: "What things are subject to taxation, and the amount and method of levying and collect-

ing taxes are essentially matters of legislative concern with which courts will not interfere unless some provision of the Constitution is clearly violated.''

To the same effect is the case of *Beals* v. *Board of Supervisors of Amador County,* 35 Cal. 624.

As we shall hereafter point out, under the different acts of the legislature referred to it was competent for the city to fix the burden of the expense of the improvements undertaken, upon all of the property situate within its corporate limits; that is, the city as a city might have assumed the expense of making the public improvements heretofore mentioned instead of dividing the city into acquisition and improvement districts. That the work mentioned was and is of a public character, was alike beneficial to all of the residents of the city, and also an improvement tending to enhance the value of all of the property of the city, needs only a statement thereof to support its public character and as being work that might have originally been paid for by the city, or the expense thereof originally assumed by the city. This would have placed the burden thereof upon all of the property lying within the exterior boundaries of the municipal corporation.

We find nothing in the Constitution prohibiting retrospective legislation relative to the subjects which we are considering. It follows, therefore, that what the city might have done originally, it is, under the act of the legislature approved June 21, 1937, empowered to do now.

Finding that the pecuniary interest of a city has been seriously disadvantaged by the method of paying for the public improvement, which affects all of the property within the city and all of the citizens within the city, there appears to us to be no constitutional objection to the rectification of the mistake originally made in dividing the city into two acquisition and improvement districts. That retrospective legislation in civil matters is not unconstitutional is supported by the following cases: *City of Los Angeles* v. *Oliver,* 102 Cal. App. 299 [283 Pac. 298]; *McCann* v. *Jordan,* 218 Cal. 577 [24 Pac. (2d) 457].

In Cooley on Taxation, third edition, volume 1, page 492, it is thus stated: ''Unless the Constitution prohibits retrospective legislation, the basis of an assessment of taxes may as lawfully be retrospective as the reverse, that is to say,

it may as well have regard to benefits theretofore received as to those which may be received thereafter. It has therefore been properly held that there is no constitutional or other legal objection to the levy of taxes to pay for municipal improvements which had previously been made, or to the assessment or reassessment of taxes upon property which has escaped taxation, or had been grossly undervalued for taxation in previous years."

As we have said, the city might in the first place have assumed the burden of the public improvement, we think it competent, under authorities which are later cited herein, for the city to correct any errors or mistakes that may have been made in organizing the respective districts and imposing the burden of a public improvement upon such districts.

While it may be conceded that a street improvement is a benefit to abutting property, common knowledge teaches us that the general public is more advantaged by such improvement, and makes far more use thereof than does the owner of the abutting property.

Under the act of February 25, 1901, payment of the costs of the property might have been made by the city. This question is discussed, and what we have said as to the power of the city,—approved in the case of the *City of San Diego* v. *Potter,* 153 Cal. 288 [95 Pac. 146].

The objection that the act under consideration is a violation of a contract or contracts, contrary to both the state and federal Constitutions, is without merit. Under the authorities cited in *Hershey* v. *Cole,* 130 Cal. App. 683 [20 Pac. (2d) 972], the bonds issued creating a liability against respective districts does constitute a contract, but the act under consideration is not mandatory in any of its provisions so far as it relates to bondholders. The act is permissive only, so far as they are concerned. Bondholders are at liberty to accept provisions of the act and surrender their securities, or they can refuse to surrender the same and rely upon the provisions of the law in accordance with which the bonds were issued. This constitutes a complete answer to the contention that the act in question is violative of any contract sections of either the state or federal Constitutions. Nor is the act violative of section 31 of article IV of the state Constitution, which prohibits giving or lending of credit, or making any gift to any person, association, or corporation, whether municipal or otherwise.

The act under consideration, when carefully considered, is found to be only the assessment of a burden, as we have said, which the city might have assumed in the first instance, and is only, so far as the property owners are concerned, the relieving of them from an inequitable, and what has proven to be an unjust imposition. On the other hand, the course to be pursued by the city is designed to, and will restore to the city assessment rolls an almost unlimited number of lots which, by reason of being allowed to go delinquent on account of the excessive burdens imposed thereon by the city, no longer yields any tax revenue to the city, by reason of which the economic position of the city is greatly impaired. The record before us shows that already 35 per cent of the taxable property of the city has been allowed to go delinquent, and no longer yields any revenue to the city, by reason of the city's not having assumed the burden of the public improvement in the first instance.

The difference between the act under consideration and the one condemned in the action entitled, *City of Redwood City* v. *Myers,* 7 Cal. (2d) 283 [60 Pac. (2d) 291, 108 A. L. R. 727], is readily apparent. The act under which the City of Redwood City was proceeding did not contemplate the relief of the distressed condition of the retiring of the bonds which imposed that condition, but was simply an investment proposition. Even in that case the Supreme Court used the following language: ''We have recently held that where property within Improvement Districts has been sold for delinquent assessments, and hopelessly withdrawn from the tax rolls of the County, to such an extent as to seriously impair the County revenues, a statute which recognizes this serious condition in which the County is placed by the unusually large amount of delinquent property, and authorizes the expenditure of public money, within reasonable limits, for the purpose of assisting the distressed property owners and thus restore this delinquent property to the tax rolls of the County, is a legitimate use of public funds.'' (Citing, *County of Los Angeles* v. *Jones,* 6 Cal. (2d) 695 [59 Pac. (2d) 489], and *County of San Diego* v. *Hammond,* 6 Cal. (2d) 709 [59 Pac. (2d) 478, 105 A. L. R. 1155].)

Considering the same question the Supreme Court, in the case of *City of Dunsmuir* v. *Porter,* 7 Cal. (2d) 269 [60 Pac. (2d) 836], held that the fact that bondholders or others

might receive some direct or indirect benefit, would not prevent the city from carrying out the public purpose contemplated by the act of the legislature authorizing cities to take action similar to that provided for in the act under which the city in this case is proceeding.

Practically every question tendered for our consideration has been passed upon in the case of the *City of San Diego* v. *Hammond, supra.* A like situation was there presented which is presented to the city in the instant case. There, property had gone delinquent, revenues of the county of San Diego were being so impaired as to render it problematical as to whether the county would be able to meet its current expenses, and enforce the various provisions of the law incumbent upon counties.

The Hammond case, *supra,* appears to be supported by numerous cases involving like questions decided in other states, from one of which we will quote:

In *Durrett* v. *Davidson,* 122 Ky. 851 [93 S. W. 25, 8 L. R. A. (N. S.) 546], it appears that after turnpikes had been constructed under an act of the legislature of that state imposing the burden of paying therefor upon certain districts, and the act proving unjustly burdensome and inequitable, the legislature later on adopted a statute providing for a general tax by the county to pay the bonds issued for the benefit of the turnpike taxing districts within the county. The court said: "We conclude, then, both upon reason and authority, that the power of fixing the burden of taxation to meet the indebtedness arising from the construction of the turnpikes in Kenton county being originally possessed by the legislature, when it was afterwards ascertained that the first plan was unjust and inequitable, it was within the province of the law-making power to readjust this burden upon a new and more equitable plan, and therefore, the act of 1906, which seeks to do this is valid." The act under consideration in that case and the results from imposing a burden upon turnpike districts, eventuated in just the condition which we find in the plaintiff city. The act of the legislature in that case, just as here, was retroactive. (See, also, *Sacramento etc. Drainage Dist.* v. *Riley,* 199 Cal. 668 [251 Pac. 207].) Likewise, if chapter 494 of the Statutes of 1937 be considered as prospective legislation, contemplating new or additional benefits to the state at large, we find the Supreme Court has

already upheld such legislation. (*Veterans' Welfare Board* v. *Jordan*, 189 Cal. 124 [208 Pac. 284, 22 A. L. R. 1515]; *American Co.* v. *City of Lakeport*, 220 Cal. 548 [32 Pac. (2d) 622].)

We may add again that a study of chapter 494, *supra*, and the Statutes of 1937, we think shows that the object of the act is not to make a donation either to the bondholders or to the property owners, but has for its purpose the restoring to the tax rolls of the city the property which is being caused to go off the tax rolls and become delinquent by reason of the excessive burdens theretofore cast upon the owners of such property. This benefit to the city is direct and primary, and therefore is not governed by any incidental considerations.

There are a few cases, such as that of *Stanley* v. *City of Great Falls*, 86 Mont. 114 [284 Pac. 134, 70 A. L. R. 166], and *Oregon Shortline Ry. Co.* v. *Berg*, 52 Idaho, 499 [16 Pac. (2d) 373], which take a contrary view, but as pointed out by the petitioner herein the factual conditions in those cases are readily distinguishable from what is presented to us upon the record in this case. However, as the Supreme Court of California has taken a directly contrary position, it is incumbent upon us to follow the decisions of our own Supreme Court.

We find nothing in the act changing the method of taxation and the relieving of the assessment districts from bearing the entire burden of the cost of improvement which constitutes the taking of any property of the taxpayers within the city without due process of law. Nor does it constitute any burden of double taxation, as the district bonds are to be retired and the cost of improvement simply assumed by the city, and taxes to be levied therefor will be levied upon all the property within the exterior boundaries of the city.

Other authorities might be cited supporting the statements which we have herein made, but what we have said we think sufficiently shows that chapter 494, Statutes of 1937, is constitutional; that the proceedings taken by the city are for the accomplishment of a public purpose; that there is nothing in either the state or federal Constitution inhibiting the proceedings being taken; that the public welfare of the city will be enhanced and its economic condition improved.

It follows necessarily that the writ prayed for should be granted. And it is so ordered.

Pullen, P. J., and Thompson, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 14, 1938.