[S. F. No. 17098. In Bank. Dec. 28, 1944.]

DEE DELANEY, Petitioner, v. J. M. LOWERY, as County Auditor, etc., et al., Respondents.

Hanna & Morton for Petitioner.

J. H. O'Connor, County Counsel (Los Angeles), and A. Curtis Smith, Deputy County Counsel, for Respondents.

CARTER, J.—The assessor of Los Angeles County has entered in that portion of the assessment roll for the fiscal year 1944-1945, designated as the secured roll, the interests of lessees under leases for the production of petroleum products, and the assessment roll has been transmitted by the county board of supervisors to the respondent county auditor to compute the taxes for the current fiscal year. Respondent is engaged in computing the taxes on those interests as though they were unsecured taxes and the interests were listed on the unsecured roll, using the rates on the secured roll for the previous fiscal year, 1943-1944, rather than the rates for the current year, 1944-1945. The secured roll is that part of the assessment roll containing property, the taxes on which are a lien on real property sufficient in the opinion of the assessor to secure the payment of the taxes, and the unsecured roll constitutes the remainder of the assessment roll. (Rev. & Tax. Code, § 109.)

Petitioner, a taxpayer, prays for a writ of mandate to compel the respondent auditor to compute the taxes on those lessee interests in oil leases, hereinafter referred to as lessee interests, according to the current 1944-1945 rates and respondent tax collector to collect the taxes accordingly. He alleges in his petition that there are many separate leasehold estates for the production of petroleum products from beneath the surface of the earth which are owned by persons not owning land or other real estate sufficient to secure the payment of taxes on those leasehold estates; that these estates are created by written leases whereby the owner-lessor of land conveys or grants to the lessee the exclusive right to drill for, produce and have the petroleum products under said land for a fixed time or so long as the products may be produced; that all of said lessee interests are taxable property, and the secured tax rates of certain school districts for the current fiscal year of 1944-1945 are higher than the rates for the prior fiscal year /1943-1944, and if the rate being used by respondent is permitted, the county will not obtain as much revenue. In that connection it may be observed that the effect on the amount of taxes of the application of the rate for the preceding year or current year would vary from year to year according to whether the rate for the current year was the same as or more or less than the rate for the preceding year.

Respondents are apparently proceeding under a provision of the Constitution which reads:

"The taxes levied for any current tax year upon personal property and assessments upon possession of, claim to, or right to the possession of land and upon taxable improvements located on land exempt from taxation, which are not a lien upon land sufficient in value to secure their payment, shall be based upon the rates for taxes levied for the preceding tax year upon property of the same kind where the taxes were a lien upon land sufficient in value to secure the payment thereof. Nothing in this section shall be construed to prohibit the equalization each year of the assessment on such property in the manner now or hereafter provided by law." (Cal. Const., art. XIII, § 9a.) Petitioner, on the other hand, relies upon a tax statute as amended in 1943. (Stats. 1943, ch. 1133.) It provides (the portions added by the 1943 amendment appearing in italics) as follows:

" 'Possessory interests' means the following:

"(a) Possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person.

"(b) Taxable improvements on tax exempt land.

"*Except as provided in this section,* possessory interests shall not be considered as sufficient security for the payment of any taxes. *Leasehold estates for the production of gas, petroleum, and other hydrocarbon substances from beneath the surface of the earth, and other rights relating to such substances which constitute incorporeal hereditaments or profits à prendre, are sufficient security for the payment of taxes levied thereon. Such estates and rights shall not be classified as possessory interests, but shall be placed on the secured roll.*

"*In the event of delinquency in the payment of any installment of taxes on such leasehold estates or rights, they shall be subject to seizure and sale in the same manner as provided for the seizure and sale of possessory interests in Sections 2914 to 2919, inclusive, at any time within one year after the delinquency. Suit may be brought against an assessee of such taxes in the event of delinquency in the payment thereof.*" (Rev. & Tax. Code, § 107.)

Respondents contend (1) that the Legislature by the 1943 amendment to section 107 did not intend to make and has

not made taxes on such interests a lien thereon thus necessitating the application of the secured rates, secured rates being those fixed for the current fiscal year rather than the preceding year; and (2) that if it is given such interpretation it is invalid because in contravention of article XIII, section 9a of the Constitution, *supra,* and is special legislation for a limited class of possessory interests and also violates other provisions of the Constitution. (Cal. Const., art. I, § 11; art. IV, §§ 25(33), 25(10); art. XIII, § 14.)

Section 107 is clear and explicit in its wording. In subdivision (a), a possessory interest is defined in precisely the same words as are used in article XIII, section 9a of the Constitution hereinafter referred to as section 9a. It is then provided, with the exception here involved, that such possessory interests shall not be sufficient security for the payment of taxes. The exception is not only that "leasehold estates" of the character here involved *are* sufficient security for taxes thereon, but furthermore, they *may not be classified as possessory interests and must be placed upon the secured roll.* Effect must be given to those words regardless of the results which may flow from the placing of such interests on the secured roll and removing them from the possessory interests class. It seems clear to us, therefore, that in requiring the placing of those interests on the secured roll, the Legislature must have had in mind the other provisions of the tax law which define the term "secured roll" and intended that certain results would flow therefrom. We have seen that the secured roll consists of that portion of the assessment roll containing assessments of property which are liens on real property. (Rev. & Tax. Code, § 109.) Real property includes possession of, claim to, ownership of, or right to possession of land and all mines and minerals in the land and all rights and privileges appertaining thereto. (Rev. & Tax. Code, § 104.) That lessee interests may be classified as real property is clear from the definition thereof in the statute which by its very wording embraces rights and privileges appertaining to minerals in land. (See *Graciosa Oil Co.* v. *Santa Barbara,* 155 Cal. 140 [99 P. 483, 20 L.R.A.N.S. 211].) Hence, taxes may be a lien on that character of real property although mere possessory interests are not sufficient security for taxes, and thus should not be carried on the secured roll; however, the character of lessee interests, "leasehold estates,"

specified in the 1943 amendment to section 107 are declared *not* to be possessory interests, and are to be placed on the secured roll. (Rev. & Tax. Code, § 107.) A tax on real property is a lien on the property assessed. (Rev. & Tax. Code, § 2187.) "Unsecured property," is property the taxes on which are not a lien on real property sufficient in the opinion of the assessor to secure the payment of such taxes. (Rev. & Tax. Code, § 134.) On or before October 1st, the auditor shall deliver the secured roll to the tax collector. (Rev. & Tax. Code, § 2601.) Taxes on the secured roll being a lien on real property are due, one-half, on November 1st, and the other half on January 20th (Rev. & Tax. Code, §§ 2605, 2606), and the respective installments are delinquent on December 5th and April 20th. (Rev. & Tax. Code, §§ 2617, 2618.) On the other hand, taxes on unsecured property (which means the same as taxes on property on the unsecured roll; see Stats. 1943, ch. 689, § 13), are due on the lien date in March (Rev. & Tax. Code, § 2091), and are delinquent on September 1st. (Rev. & Tax. Code, § 2922.) By the express provisions of the last paragraph of section 107 the taxes on the interests here involved may be collected by seizure and sale the same as taxes on unsecured property under sections 2914 to 2919 of the Revenue & Taxation Code within one year after delinquency and suit may be brought therefor. Finally, section 2905 of the Revenue & Taxation Code provides:

"In collecting taxes on *unsecured property* the tax rate to be used is the rate for property of the same kind on the secured roll last fixed before the lien date for the taxes to be collected. The taxes on unsecured property shall be computed in dollars and cents, rejecting the fractions of a cent."
(Italics added.) The clear implication from that section is that the rate of taxes on secured property or the secured roll is that for the current year which is the general rule rather than the exception. It follows from sections 2151 and 2152 that the general rule is that the current rate is to be applied unless there is an exception. The former section reads:

"The board of supervisors shall fix the rates of county and district taxes and shall levy the State, county, and district taxes as provided by law." And the latter:

"The auditor shall then: (a) Compute and enter in a sep-

arate column on the roll the respective sums in dollars and cents, rejecting the fractions of a cent, to be paid as a tax on the property listed. (b) Place in other columns the respective amounts due in installments. (c) Foot each column, showing the totals.'' We see no reason to suppose that the Legislature did not intend by the use of the terms in section 107 to have the same effect given thereto as are given to those terms where they are used elsewhere including the tax rates to be applied.

Respondents assert, however, that the historical background, including case law, and statutory and constitutional provisions, requires a contrary conclusion; that under case law the theory that a lessee in an oil lease acquires a fixed quantity of the substance of the earth in place has been rejected, and the rule adopted that such interest is one in real property, a profit à prendre, an incorporeal hereditament; that it was in the light of that rule that section 9a of article XIII of the Constitution was amended in 1936 to describe such possessory interests, the section when adopted in 1924 having embraced only personal property, and the 1936 amendment, by adding possessory interests in land, was designed to include the lessee interests here involved. Reference is also made to the argument addressed to the voters when the 1936 amendment was under consideration where it was said:

''The amendment here proposed will make clearer and extend to its logical conclusion the change intended when section 9a was added to the Constitution in 1924. It will simplify the collection of taxes on these property rights which the law says are *real property but which are not land* and will contribute to the reduction of the cost of government by eliminating some clerical work, not large in amount perhaps but costing something and producing results not at all worth the cost. Before this section was written in 1924, taxes on personal property unconnected with land and on certain *rights connected with land but not the land itself* were collected each year before the tax rate was fixed, at the rate for the preceding year. When the new rate was fixed, if it was higher than the old one, a difference in amount of tax had to be collected; if the new rate was lower, the difference had to be refunded. This made necessary the recomputation of many thousands of items and the seeking or refunding of

many very small sums of money: from one cent to a few dollars: an expensive process. This was largely, but not quite completely, remedied in 1924 and certain clerical costs were eliminated; *but oil and mining rights and improvements on leased land or on land exempt from taxation, for which the land cannot be held,* are not covered by the original language of this section and it is still necessary to compute and collect or refund deficiency or excess collections on such rights. The adoption of this amendment will make the first collection final on this class of property, as it now sensibly is on the much larger class known as unsecured personal property and will eliminate entirely the remnant of this annoyance." (Italics added.) The purpose of the adoption of section 9a in 1924 authorizing the use of the tax rate for the prior year for unsecured taxes on personal property which was extended to possessory interests in land by the 1936 amendment, was to avoid the necessity of refunds and supplemental assessments arising because such unsecured taxes were collected before the current rate was fixed and were computed tentatively on the rate for the prior year, and to avoid any claim of unconstitutional lack of uniformity in the rate. (See 24 Cal.Jur. 279-80.) It is apparent that this purpose is not frustrated by a statutory enactment which provides that lessee interests are sufficient security for the payment of taxes, that such interests be placed on the secured roll and the taxes thereon computed at the current rate. It should be kept in mind that we still have the clear cut language of the Legislature in the 1943 amendment to section 107 which leaves the definition of possessory interests the same as it theretofore existed, and as defined in the Constitution, and then squarely states that the interests here involved are not possessory interests, are sufficient security for the payment of taxes and must be placed on the secured roll. To give effect to those words we must apply the rate provision which is applicable to interests having those characteristics.

It is respondents' position that with the foregoing interpretation placed upon section 107 it is contrary to section 9a, article XIII of the Constitution because of the above-mentioned historical factors. They claim that the phrases in the Constitution "possession of, claim to, or right to the possession of land," the taxes on which are not a "lien on land" sufficient to secure their payment, inescapably embrace

the lessee interests, and therefore the rate must be that for the prior year, striking down the 1943 amendment to section 107. Obviously, all the Legislature did by the 1943 amendment was to interpret and construe phrases used in the Constitution on the subject of taxation. By declaring that lessee interests shall not be classified as possessory interests, it was, by the definition of such interests, given in the forepart of the section (possession of, claim to, or right to the possession of land), declaring that such interests described by the phrase "possession of, or claim etc." do not embrace lessee interests. Those phrases are identical with those used in section 9a of article XIII and must be considered as an interpretation or definition of the scope of the meaning thereof. Hence, we are concerned with the extent of or limitation upon the legislative power in that respect.

█ Generally the Legislature is supreme in the field of taxation, and the provisions on taxation in the state Constitution are a limitation on the power of the Legislature rather than a grant to it. (*Taylor* v. *Palmer,* 31 Cal. 240, 241, 253; *People* v. *Pacheco,* 27 Cal. 175, 176, 209; *McCauley* v. *Brooks,* 16 Cal. 11; *City of Crescent City* v. *Moran,* 25 Cal.App.2d 133, 136 [77 P.2d 281]; *Roth Drug, Inc.* v. *Johnson,* 13 Cal. App.2d 720 [57 P.2d 1022].) Its power in the field of taxation is limited only by constitutional restrictions. (See *In re Madera Irrigation District,* 92 Cal. 296 [28 P. 272, 675, 29 Am.St.Rep. 106, 14 L.R.A. 755]; *Lent* v. *Tillson,* 72 Cal. 404 [14 P, 71]; *Stockton & V. R. R. Co.* v. *City of Stockton,* 41 Cal. 147; *People* v. *Pacheco, supra; People* v. *Seymour,* 16 Cal. 332 [76 Am.Dec. 521]; *Nougues* v. *Douglass,* 7 Cal. 65; *Beals* v. *Amador County,* 35 Cal. 624; *People* v. *McCreery,* 34 Cal. 432.) Those principles are a part of the broader concept that ". . . Our Constitution is not a grant of power but rather a limitation or restriction upon the powers of the Legislature. . . ." (*Collins* v. *Riley,* 24 Cal.2d 912, 916 [152 P.2d 169].) █ As a result constitutional restrictions on the power of the Legislature must be strictly construed against the limitation. (See *Central P. R. R. Co.* v. *Board of Equalization,* 60 Cal. 35, 59-60; and *Collins* v. *Riley, supra.*) We said in *Collins* v. *Riley, supra,* at 910:

"If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations

are to be construed strictly, and are not to be extended to include matters not covered by the language used." That rule is a corollary of the strong presumption of the constitutionality of an act of the Legislature. (5 Cal.Jur. 628 et seq.) ▮ Those principles indicate the latitude and effect to be given a legislative construction or interpretation of the Constitution. When the Constitution has a doubtful or obscure meaning or is capable of various interpretations, the construction placed thereon by the Legislature is of very persuasive significance. (*Kaiser* v. *Hopkins,* 6 Cal.2d 537 [58 P.2d 1278]; *Hammond* v. *McDonald,* 49 Cal.App.2d 671 [122 P.2d 332]; 5 Cal.Jur. 604-605.) In accordance with that principle and also with section 13 of article XIII of the Constitution that "The Legislature shall pass all laws necessary to carry out the provision of this article" (article XIII dealing with taxation), the Legislature is authorized to define the term "improvements" as used in the constitutional provisions on taxation. (See *Miller* v. *County of Kern,* 137 Cal. 516 [70 P. 549]; *Cottle* v. *Spitzer,* 65 Cal. 456 [4 P. 435].)

▮ Clearly the placing of the lessee interests outside the description, "possession of, claim to, etc.," and within the phrase "a lien on land," with the resulting different tax rate, was not unreasonable or arbitrary. The exact nature of the interests of a lessee under an oil lease has been the subject of much controversy in considering tax matters and other issues. Their nature is far from certain or definite. They are obscure to say the least. In a tax case they have been described as extending to the "substance of the land itself" and the object of the lease is to effect, if not technically a sale and conveyance of a specific part of the land, at least a disposition and transfer thereof. (*Graciosa Oil Co.* v. *Santa Barbara, supra.*) While it may be that the Graciosa case adhered to the oil-in-place theory,—that the rights therein were to a fixed portion of the substance of the earth, which has since been repudiated (see 8 Cal.Jur. Ten-Yr. Supp., Oil & Gas, pp. 606-607, 626-628), it may be said that for taxation purposes the lessee's interest is materially different from, and more than the interest of a lessee under an ordinary lease for use and occupation (*Graciosa Oil Co.* v. *Santa Barbara, supra*). It is true that in the Graciosa case the court stated a lessee's interest "may well be termed a claim to land," still it does not follow that the use of the phrase "claim to land"

necessarily must include the lessee's interest as defined in section 107. It is really more than that. In other fields of the law lessee interests have been described in various ways. ''The authorities generally are not harmonious as to the precise nature of an oil and gas lease, some courts viewing it as a mere license and others regarding it as similar to the usual usufructuary lease. These theories have, however, been repudiated in California, and it now seems to be the settled rule in this State that the usual form of lease passes to the lessee a present interest and estate in land in the nature of a profit à prendre in gross. As to whether such an interest constitutes real property appears to depend largely upon the phraseology of the lease. If it runs only for a fixed term of years, the lessee acquires an estate known at common law as a chattel real, which is regarded as a species of personal property; but if it runs for a term of years 'and so long thereafter as oil or gas shall be produced in paying quantities,' apparently it may properly be regarded as passing a qualified or determinable fee in real property. . . . The lease merely grants him certain rights in respect of the property—to enter upon the land, explore it for oil and gas and extract them if he can find them. But within the scope of this grant, the lessee's rights are absolute. The lessor cannot restrict his explorations to any particular stratum, nor tell him how many wells he may drill.

''This right of entry, exploration and extraction necessarily includes a right to possession of such portions of the surface as may be necessary for the operations contemplated by the lease. And the right of possession is sufficient to entitle the lessee to complain of a larceny of oil or gas or to maintain an action to recover possession of the leasehold or to quiet his title thereto.'' (8 Cal.Jur. Ten-Yr. Supp., Oil & Gas, p. 624.) Whatever its precise character may be it cannot be doubted that it is an interest of a peculiar character and need not be necessarily embraced in the phrases ''possession of, claim to, etc.'' to the extent at least that the Legislature may not reasonably declare that it is not included therein.

The clause in section 9a referring to taxes, ''which are not a lien upon land sufficient in value to secure their payment,'' following the mention of the possessory interest, does not so limit the possessory interests to the exclusion of action by

the Legislature. That is a descriptive phrase and refers only to those possessory interests which are of such a character that they are not adequate security for the payment of the taxes thereon. It is true that under section 9a as it read after its adoption in 1924, it referred to taxes on property which were not sufficiently secured by a lien on real estate, whereas the 1936 amendment used the term land instead of real estate, but the above analysis of the clause indicates that the word "land" was not to be given a narrow or literal interpretation. There was left to the Legislature a determination of what should be sufficient security as long as the interest was such that it could reasonably fall within the term land. In the long run no one will be injured inasmuch as the current rate or the prior year's rate will either not make any difference in the amount of the tax or may some years be more and others less. We have seen that a lessee's interests as defined in section 107 are more than the interests of an ordinary lessee. It is an estate in land—an interest in real property. The owner-lessor as a part of his ownership of the land has the exclusive right to remove the oil, but does not own the oil in place (8 Cal.Jur. Ten-Yr. Supp., Oil & Gas, p. 606), yet it is in a sense a part of his land. When he transfers that interest, the transferee or lessee must acquire the same interest. The Legislature has concluded that such interest is sufficient security and we are not disposed to override its policy by adopting a restricted definition of the word "land," especially when we are mindful of the rule that section 9a, being a restriction on the power of the Legislature, must be construed if reasonably appropriate to uphold the constitutionality of the legislation. The word land has various meanings both broad and narrow. For illustration it is said in 42 American Jurisprudence, Property, section 14:

"The word 'land,' both in England and here, is a word of art. It is nomen generalissimum and includes not only the soil, but everything attached to it, whether attached by the course of nature, as trees, herbage, and water, or by the hand of man, as buildings, fixtures, and fences. While it generally refers to something corporeal, it may include a franchise connected with land. This is the broadest of the two common-law meanings of the term. In its more limited sense the term denotes the quantity and character of the interest which one may own in the lands. When used to describe the quanity of the estate it is understood to denote a

freehold estate at least. When used in this sense it is almost synonymous with estates, which are the subject of separate treatment. Ordinarily, however, the term is used as descriptive of the subject of ownership and not the ownership. Thus, in its broadest sense it will be seen that 'land' in its legal signification embraces much more than the word literally imports, and includes many things besides the soil itself, as waters, grass, stones, buildings, fences, trees, and the like, and in fact all things which have become a part of the soil. The meaning of the word is often restricted by the manner of its use. Thus in a grant of lands, meadows, and pastures, it is held to mean only arable land.'' Applying the appropriate rules of construction, *supra*, the broad meaning should be adopted, even though lessee interests were by the cases of this court said to be a profit à prendre, interest in real property, an incorporeal hereditament, in 1936 when section 9a was amended. That description of the interests still did not exclude them from the broad term "land."

The argument addressed to the voters when the 1936 amendment to section 9a came before them does not change the foregoing conclusion. The statement that oil and mining rights are not covered by section 9a as it then read was probably true because it referred only to personal property. The chief result to be achieved, as seen from the whole argument was the elimination of administrative difficulties in collecting the taxes rather than that the previous year's rate should be applied. That result has been accomplished as to lessee interests by the 1943 amendment to section 107 of the Revenue & Taxation Code by making the current rate applicable. The only remaining question is the one involving the adequacy of the security which as before mentioned lies within the sound judgment of the Legislature.

In regard to the contention that lack of uniformity and discrimination will exist if lessee interests are taxed at a rate different from possessory interests, such as the lessee's interest under an ordinary lease for use and occupation, it should first be observed that, as indicated by the foregoing discussion, such interests are in a class by themselves and are different from other species of property. The rate fixed is that for the current year, which is the normal situation, and it is primarily a legislative matter to determine whether such interests are not sufficient security for the payment of

taxes thereon. Clearly, property may be classified for the purpose of taxation as long as the classification is reasonable, and that is especially true where, as seen, the effect through the years will probably be insignificant. There is a valid distinction between secured and unsecured taxes. (*Abrams* v. *San Francisco,* 48 Cal.App.2d 1 [119 P.2d 197]; *Rode* v. *Siebe,* 119 Cal. 518 [51 P. 869, 39 L.R.A. 342].) The proper classification is made in permitting the seizure and sale of lessee interests inasmuch as the security may be lost. (*Mohawk Oil Co.* v. *Hopkins,* 196 Cal. 148 [236 P. 133].) It should follow, that where the Legislature determines, as it has by section 107 of the Revenue & Taxation Code, that such interests bear the current tax rates; taxes are payable in installments, and the state retains the benefits which may accrue from the right of seizure and sale to enforce collection of the taxes, we cannot say the classification is arbitrary.

For the foregoing reasons it is ordered that a peremptory writ of mandate issue as prayed for in the petition.

Gibson, C. J., Shenk, J., Curtis, J., and Traynor, J., concurred.