[No. 9,598. In Bank.—July 26, 1884.]

ROYAL COTTLE, APPELLANT, v. L. A. SPITZER, RESPONDENT.

TAXATION—FRUIT TREES—GROWING CROPS.—Fruit trees are not growing crops within the meaning of article xiii., section 1, of the Constitution, and are subject to taxation.

APPEAL from a judgment of the Superior Court of the county of Santa Clara.

The plaintiff applied for a writ to compel the defendant, who was assessor of the county of Santa Clara, to desist and refrain from assessing certain fruit trees for the purpose of taxation. A demurrer to the petition was sustained, and the writ denied. The facts are sufficiently stated in the opinions of Judges Spencer and Belden, which were adopted by this court.

S. F. Leib, for Appellant.

James H. Campbell, for Respondent

The COURT.—For the reasons stated in the opinions of the judges of the Superior Court, hereto subjoined, judgment affirme

Petition for rehearing denied

The following are the opinions referred to:—

JUDGE SPENCER'S OPINION.

" Application for an alternative writ of prohibition by the owner of certain lands and fruit trees growing thereon, to prevent the assessor from assessing said trees for the purpose of taxation. The contention of the plaintiff is that this class of property is included in the term 'growing crops,' as found in the Constitution of the State, exempting the last-named class of property from taxation. It is the settled policy of all governments, republican in form, that the burdens of taxation shall fall equally upon their citizens. Where resort is had to direct ad valorem taxes for the purpose of revenue in order to carry out both the letter and spirit of that policy, it becomes necessary that property should be assessed for taxation not only according

to a just and uniform standard of value, but that *all* property should be thus assessed and taxed; for if the property of A is taxed, and that of B is left to go untaxed, it is manifest that the burdens of taxation have been very unequally imposed upon the people. Consonant with this principle, which is a cornerstone in the structure of a free government, the Constitution of the State provides that 'all property in the State, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law.' And in order that there should be nothing left to construction whereby any particular kind of property may escape payment of its just proportion of taxes, it is added: 'The word "property," as used in this article and section, is hereby declared to include moneys, credits, bonds, stocks, dues, franchises, and all other matters and things real, personal, and mixed, capable of private ownership.' (Art. xiii., § 1.) Upon such constitutional provision, set forth in all its fullness, iterating a cardinal principle of justice, is engrafted the apparent exception thereto, 'that growing crops . . . . shall be exempt from taxation.' It is a rule of construction of uniform application that he who seeks to avail himself of the benefits of an exception to a general rule or provision, must show with reasonable clearness that he has brought himself within the terms of its qualifying clauses. He can take nothing by implication, and all the intendments are against him. Thus premising, we proceed to inquire the meaning of the term 'growing crops,' as used in the organic law. 'Crop,' as defined by Webster, is: '3d, that which is gathered; the corn or fruits of the earth collected; harvest. The word includes every species of fruit or product gathered from man or beast. 4th, Corn or other cultivated plants while growing [a popular use of the word]. 5th, Anything cut off or gathered.' The etymology of the word 'crop' appears to be from the Saxon 'crop' or 'cropp,' signifying the crop of a fowl, a cluster of ears of corn, grapes, ears of corn, and from the Welsh 'copiad,' a gathering or taking hold of. (Webster, verb. crops.)

"The definition given by Webster is even broader than the popular signification of the word. Under the former, as we see, not only is meant grain produced from annual vegetation, but also fruits from trees and perennial plants. But it is at least

doubtful if, under the common and restrictive acceptation of the term, anything more would be understood than products from annual plants, as cereals, maize, etc., and the latter appears to be the sense in which the term is employed in technical legal parlance. 'Crops,' says Bouvier, 'is nearly synonymous with emblements' and by that term is understood the crops growing upon the land. By crops is here meant the products of the earth which grow yearly, and are raised by the annual expense and labor or 'great manurance and industry,' such as grain; but not fruits which grow on trees, which are not to be planted yearly, or grasses and the like, though they are annual.' (Bouvier's Law Dict., word, 'emblements.') It may be conceded, and correctly, that at the present day, in this State at least, the word 'crop,' taken in its most comprehensive sense, includes fruits grown on trees, but I think it can be affirmed without serious contradiction, that trees themselves, capable of producing fruit, never have been included in that term. As I understand the able and ingenious argument of the learned counsel for plaintiff, he does not claim that *ex vi termini* the words 'crops' or 'growing crops' include fruit-bearing trees, but because the Constitution declares that 'growing crops shall not be taxed, and inasmuch as the fruit growing upon the trees is a growing crop,' and the tree is necessary for the production of the fruit, and is substantially valueless for any other purpose, therefore the taxing of the tree is in effect taxing the crop growing or that may thereafter grow thereon, because, *arguendo,* there being no tree, there could be no crop. In furtherance of the theory thus advanced the elementary principle is invoked that whatever is forbidden to be done by direct means will not be permitted to be accomplished by indirection. A familiar application of this principle is the unsuccessful attempt sometimes made by State legislatures to evade the provisions of the Constitution of the United States, forbidding the several States from imposing duties on imports and exports. (*Brown* v. *Maryland,* 12 Wheat. 444; 24 How. 123; 15 Pa. St. 353.) In the cases cited, it was held that the imposition of a license tax by the State upon a person engaged in importing goods as such, or requiring the payment of stamp tax upon bills of lading of gold or merchandise exported from the State, was in effect and by indirect means

taxing the goods imported or exported by those instrumentalities. It was necessarily a burden upon the goods themselves; but I fail to see the applicability of the principle invoked to the subject under consideration. If a tree is not in fact a part of the crop of fruit growing thereon, I do not understand how it can be made to appear that the taxing of the former is substantially and in effect taxation of the latter. Perhaps some confusion might be avoided in dealing with this question if it be borne in mind that a crop when perfected does not fall within any exemption or exception, and is the subject of taxation. By the very terms of the Constitution, the exemption of crops from taxation is temporary, and only continues during its growing state. We have then an article of property—a tree—that year by year produces another article of recognized value, and which is taxed from the time it comes to perfection as long as it continues in existence, how can it be said that taxing of the matrix is illegal, or even unjust when its product is also taxable. I can understand that the system of reasoning sought to be enforced by the plaintiff might have weight if the product of the tree could not at any time, or under any circumstances, be taxed. If the only use to which an article can be put, and therefore the only value it has, is to produce untaxable property—it might with reason be claimed that the article cannot have any taxable value.

" In the wide range taken in the argument of this case, much was said in relation to the beneficent policy of the law in encouraging certain branches of industry by exemption from taxation, and that such supposed exemption should be encouraged, and passages in the organic law so construed as, if possible, 'to effectuate that object. The disposition of the question involved does not require an examination into the expediency or inexpediency of that kind of enactment, but it may not be out of place to here remark that if the correct principles of free government require that taxation should be equal, it is at least possible that the advantage gained in the direction of fostering a particular industry or set of industries at the expense of others, may be outweighed by the general injury resulting in the downfall of one of the pillars of the temple of liberty. In conclusion, it may be suggested that it is even doubtful if the framers of the pres-

ent Constitution intended to exempt any private property from taxation. As we have seen, the section already referred to commences with a sweeping declaration that all private property shall be taxed, which is followed by the provision that growing crops, property used exclusively for public schools, and such as may belong to the United States, this State, or to any county or municipal corporation within this State, shall be exempt from taxation. It will be noticed that all property referred to, except growing crops, is such as belongs to government, either federal or State, and therefore is not in its nature taxable. In enumerating it no attempt is made to exempt property otherwise taxable, and in relation to the single item of 'growing crops,' my conclusion is that it is in effect a declaration that it is not sufficiently tangible to be treated as property; it is in a transitory state, starting with the embryo and ending with the matured product, at no two consecutive points of time in the same condition. To attempt to place upon it any money value, would be to indulge in the merest guess-work. It has been held by the Supreme Court of this State that a lessee of land is the owner of a so called growing crop, although his husbandry has extended only to the preparation of the soil for the reception of the seed; that it is a potentiality before any seeds are sown which is subject to a valid mortgage under the law authorizing the mortgaging of growing crops. (*Arques* v. *Wasson*, 51 Cal. 620.) I apprehend it would puzzle the most experienced appraiser to fix a value upon it, or to even recognize it as property. The fact is undeniable, that land planted with orchard trees is ordinarily more valuable than the naked soil. From a legal standpoint, the land and the trees growing thereon are, together, but one piece of real estate, and might with propriety be assessed as such in gross. The legislature has seen fit, however, to require the land and trees to be assessed separately. This it has the constitutional power to do, and no hardships can result from such a course if each is fairly valued, and the total value is not increased thereby. I am of the opinion that it is the duty of the assessor to assess fruit, nut-bearing and ornamental trees, and vines not of natural growth, as directed in section 3617 of the Political Code. It results that the writ prayed for should be refused, and it is so ordered."

JUDGE BELDEN'S OPINION.

" I entirely agree in the views presented and conclusions reached by my associate, Judge Spencer. These opinions were prepared without previous consultation. To the reasons of my associate I subjoin my own.

" The rule as to the construction both of constitutional provisions and of statutes was well summarized by our Supreme Court in *People* v. *Eddy.* Said the court: ' The word "property," as used in the Constitution, is to be construed in the ordinary and popular sense, and this is the general rule for the interpretation of constitutions and statutes, unless the context shows that the words are used in a technical or in some arbitrary sense.' (42 Cal. 536.) For the court to apply any other rule upon its views either of public policy or of popular interest would be a mere judicial usurpation of legislative power. What, then, was understood by the convention which framed our present Constitution, and by the people who ratified it, by the term 'growing crops?'

" By lexicographers crop is defined as, 'that which is gathered from a single field or of a single kind of grain or fruit, for a single season; especially the valuable product of wheat if planted in the earth — fruit harvest.' [Webster.] 'That which is gathered as fruit, the harvest.' [Worcester.] In popular parlance the word has the same universal meaning, and the phrases ' cropping contracts,' ' interest in crops,' ' harvesting crop,' and the like, are used in the precise sense in which they are defined in dictionaries. This phrase has also received a practical and general construction in the action of public officials. In 1851, the legislature attempted, with other classes of property, to exempt 'growing crops' from taxation, and from that time until the decision in *People* v. *McCreery,* in 1867, this exemption was conceded by the assessors. During all this period it is a matter of universal knowledge that this exemption was only asserted, and allowed for annual and immature crops, and it was never pretended that trees or vines of perennial growth came within it. Again, in 1855, a statute provided 'that no person, for mining purposes, shall destroy or injure any growing crops of grain or garden vegetables growing upon the mineral lands of this State, nor undermine or injure any house, building, improvements, or fruit

trees standing upon any mineral land, and the property of another.'

"In this provision a 'growing crop' was not understood by the legislature to mean growing trees, or we have a useless repetition of phrases. Again, in 1859, and while the general exemption as to 'growing crops' was in practical effect, it was enacted:—

"'No tax of any nature whatever shall be hereafter assessed or collected from the owners, managers, or agents of newly planted vines or olives, on account of the same until the vine shall have attained the age of four years and the olive seven years.'

"A clearer indication that these were not then understood as included in the term 'growing crops' already exempted, cannot be conceived, while by a familiar rule of construction the special designation of 'grapes' and 'olives,' as exempt, is the legislative declaration that all trees not so specified are to be taxed. In 1868 the Supreme Court, following the former decision of *People* v. *McCreery*, and making special application of the principles of that case, held that growing crops, the annual product of the soil, could not be exempted by the legislature from taxation. (*People* v. *Gerke*, 35 Cal. 677.)

"Again, in 1878, a statute providing for a lien upon growing crops enacted:—

"'The lien of a mortgage on a growing crop continues on the crop after severance, whether remaining in its original state or converted into another product, so long as the same remains on the land of the mortgagor.' An unmistakable recognition of the fact that the legislature then understood by a 'crop' that which in ordinary husbandry was to be severed from the land when utilized. These are but a few of very many statutory recognitions of the meaning of this phrase. They clearly establish that, in the legislative mind, as well as in judicial decisions, the term had the same meaning as in lexicographies, and in the popular understanding, and this was the general understanding of this phrase when the convention assembled which framed the present Constitution. That body consisted of representatives of every class and vocation—of farmers who had benefited by the former exemption, and orchardists and vine-growers who had

been denied it; of legislators who had assisted in framing these laws, of lawyers who had discussed them, of judges who had construed and applied them. Such a body could not have been ignorant of the universal interpretation which this phrase had so long received from every branch of the State goverment, and in the popular understanding. Before this body thus composed and thus informed, came the question of the exemption of 'growing crops.' The members of this convention could but have been aware of the growing importance of the vine and fruit interest of the State. It was reported to them that fifty millions of capital was then employed in grape culture alone, and yet in all the debates upon this question, both upon the part of those who favored, and by those who opposed this exemption, constant reference is made to a crop to be sown and harvested within the same year, and not even a suggestion that trees or vines of perennial growth were referred to.

"It is indeed strange that those thus familiar with this phrase, well knowing, as they must have done, the restricted application it had before received from every quarter, interested, too, in enlarging its scope and meaning, should thus reproduce these exact words, without addition or explanation, intending or expecting that they could receive any larger or other meaning in the future than had been ascribed to them in the past. This conduct admits of but one explanation—that they then employed these words as usage, law, and legislation had already defined them.

"Eight months after the adoption of this Constitution the legislature was in session. It was fresh from the people, and from the discussions through which the Constitution had been ratified. In the Senate were six, in the assembly two representatives who had been members of the Constitutional Convention.

"Thus assisting in the interpretation of their own recent work, this first legislature enacted:—

"'The term "improvements" includes all fruit, nut-bearing, or ornamental trees, and vines not of natural growth.'

"'The term "growing crops" includes only those crops which require an annual planting or sowing, or an annual harvesting.'

"These were expressly enacted as terms of definition in the first revenue act passed after the adoption of the Constitution.

It but repeated all former definitions, and a more explicit and unequivocal interpretation of the phrase incorporated in the Constitution cannot be imagined.

"It is, however, insisted that, upon considerations of public policy, this phrase should receive a broad or enlarged interpretation. Such is not the rule which the statute prescribes for the guidance of courts. Says the Code:—

"'In the construction of a statute or instrument the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein; not to insert what has been omitted, or to omit what has been inserted. . . .' (Code Civ. Proc. § 1858.)

"Nor do I understand that these special exemptions, creating, as they do, manifest inequality as between the citizens, are to be extended by implication, or beyond their clear and expressed meaning. Said our own Supreme Court, speaking by Rhodes, J.:—

"'It is impossible to conceive of any law which is more imperatively required, by the principles of good government and the just rules of political economy, to be equal and uniform, than a revenue law. That the burdens of taxation should rest equally upon all property within the State ought to be axiomatic, not only in theory, but in practice.' (*People* v. *Eddy*, 43 Cal. 336.)

"To secure this equality was one of the controlling causes for the change in our State Constitution. It was an expression of the general discontent with exemptions established by judicial decisions. It was in this spirit the convention deliberated, and that there might be equality in the burdens of government that the people ratified.

"To again extend through the courts and by implication these exemptions, is to defeat the clearly-expressed will of the people declared in their Constitution, and reinstate the original grievance. It was insisted upon at the argument that the fruit growers would not be satisfied with an exemption accorded to the farmer and denied to themselves. That objection must be urged to the Constitution which so provides, and not to the court whose single duty it is to declare what is too plainly expressed to admit of doubt, or to call for construction. Laws

are understood as the expression of the will of all the people, and are to be neither enlarged nor restricted in their operation to conform to the wishes or in the interests of any particular class. Were the inquiry made, it might be found that the discontent with exemption extended to other classes of tax payers; nor would that discontent be allayed should the courts determine that orchards whose yearly crop produced from two hundred to four hundred dollars per acre to the owners, were to have the trees from which such revenue was derived valued no higher than the worthless brush which they supplanted. Such a decision, if it did not cause discontent, might at least excite surprise upon the part of less fortunate and less favored tax payers. Beyond all this there is a result which may follow from any mistaken interference with the assessor to which attention may well be called. It is understood that in taxing trees the assessor is following the instructions of the State Board of Equalization, issued to the assessors of all the counties. It may be assumed that unless there be some judicial interference, these directions will be followed by several assessors. In the discharge of their duties the State Board will apply one common rule to all the counties, and will pay no attention to the cause of any local undervaluation, whether brought about by the mistake of the assessor or of the court. In fact, to attempt to conform their duties to the varying decisions of the fifty-two counties of this State would paralyze the functions of this board, and wholly destroy its utility. If any class of property shall, in any county, be undervalued, the State Board cannot correct this mistake by raising the value of this particular property, but must raise the entire assessment roll of the county. This was expressly so decided in *Wells, Fargo & Co.* v. *The State Board of Equalization,* 56 Cal. 197, and is the course certain to be pursued. The result will be that if the other property within the county shall be properly valued by the assessor, and this interest placed too low, the State Board will raise the entire assessment of all the property, and every tax payer will have his assessment raised above its just valuation, the exact percentage that the State Board determines fruit trees to be below their proper value. Several counties of the State—among them Santa Clara County—had last year a very instructive and most unsatisfactory experience in this matter,

and a court may well hesitate at a course which may invite or compel a repetition of this experience. In my opinion, in all cases in which the revenue of the State is involved, and the question is one subject to revision by the State Board, the proceeding should be inaugurated in the Supreme Court. A decision from that tribunal would be accepted by the State Board as authority, and the assessors of all the counties would conform their actions to such decision. Thus, no inequalities between the several counties would be found, calling for this arbitrary, severe, and often most inequitable and oppressive interference upon the part of the State Board."