[Civ. No. 4242. Fifth Dist. Nov. 6, 1980.]

NUNES TURFGRASS, INC., Plaintiff and Respondent, v.
COUNTY OF KERN, Defendant, Cross-complainant and Appellant;
KENNETH CORY, as State Controller, Cross-defendant and
Appellant.

[Civ. No. 4410. Fifth Dist. Nov. 6, 1980.]

NUNES TURFGRASS, INC., Plaintiff and Appellant, v.
COUNTY OF STANISLAUS, Defendant and Respondent.

COUNSEL

Ralph B. Jordan, County Counsel, D. N. Reid, Assistant County Counsel, Ronald D. Wenkart and D. Sorensen, Deputy County Counsel, for Defendant, Cross-complainant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Ernest P. Goodman, Assistant Attorney General, and Edward P. Hollingshead, Deputy Attorney General, for Cross-defendant and Appellant.

Richardson & Gaskill and Robert L. Jones, Jr., for Plaintiff and Appellant and Plaintiff and Respondent.

Gilbert W. Boyne, County Counsel, John F. Christensen, Assistant County Counsel, Carl O. Waggoner, Senior Deputy County Counsel, Harry P. Drabkin and Gerarde F. Imhoff, Deputy County Counsel, for Defendant and Respondent.

OPINION

ZENOVICH, Acting P. J.—The issue before us is whether the Legislature has the authority to extend the "growing crops" exemption from

taxation (Cal. Const., art. XIII, § 3, subd. (h)) to turf grasses grown for sale and transplanted as living plants. For the following reasons we conclude that the enactment (Rev. & Tax. Code, § 202.1) is an invalid exercise of the legislative authority.

The Superior Court of Kern County granted judgment for Nunes Turfgrass, Inc. (hereafter Nunes), finding that Nunes was entitled to a refund of the taxes assessed by the County of Kern (hereafter Kern) and that Revenue and Taxation Code section 202.1[1] was constitutional under the California Constitution.

The Superior Court of Stanislaus County, however, granted judgment against Nunes, determining that assessments by the County of Stanislaus (hereafter Stanislaus) were proper and that section 202.1 was an invalid exercise of the legislative authority under the California Constitution. A question of first impression is thus presented.

The oral testimony at both trials, as well as the findings of fact and conclusions of law by both courts, do not materially differ. Nevertheless, we summarize the facts in each case and examine the successive contentions in light of the applicable law.

### The Kern Proceeding

John Nunes, president of Nunes, testified that he grew a bluegrass blend of turf grass which is sold to wholesalers and then delivered to their customers by Nunes. He then outlined the manner in which turf grass is cultivated and harvested. The bare ground is prepared for cultivation by discing and leveling operations and is followed by seeding, irrigation, and fertilization. After an average period of 9 months,[2] the turf grass is "harvested" by means of a machine that severs the roots about one-quarter inch below the ground in rectangular pieces which are 18 inches wide and 72 inches long. The grass is then rolled up, stacked on pallets, and delivered to customers for transplanting as lawn. Some roots of the plant (the feeder or hair roots) remain after harvesting, but are destroyed when the land is subsequently disced; new turf grass is not grown from the feeder roots.

---

[1] All code references are to the Revenue and Taxation Code unless otherwise indicated.

[2] Mr. Nunes stated that turf grass had been raised as quickly as four and one-half months in some instances. He also indicated that turf grass may not reach maturity in some states until around three years after planting.

Mr. Nunes testified that the turf grass is harvested within one year of planting, although it is only harvested "upon order from customers." He indicated that the general industrial practice is to harvest turf grass within one year because of economic factors. Specifically, Mr. Nunes noted that "It costs you [the turf grower] to maintain the grass, and if you keep it over a year, it would just cost you too much to maintain it. You couldn't compete in the marketplace." The bluegrass varieties grown by Nunes were classified as perennials. Mr. Nunes conceded that turf grass could be left in the ground indefinitely under proper maintenance. After harvesting in the summertime season, the grass must be transplanted within 24 hours. Bluegrass must be left in the ground awaiting orders or else it might perish. Once transplanted, bluegrass provides a lawn which will last "forever" if properly maintained.

Mr. Nunes also stated that turf grass left in the ground after peak maturity can become thatchy. In addition, the older grass is more susceptible to disease, insects, weeds, and other problems. These externalities, according to Mr. Nunes, were considerations in his decision to annually harvest.

Kenneth Hammons, senior auditor-appraiser with the Kern County Assessor's office, testified that the county had treated turf grass as nursery stock for sale since 1973. This effectively meant that the grass was characterized as personal property, which was then given the 50 percent business inventory exemption[3] rather than the 100 percent "growing crop" exemption by the county taxing authority. Hammons noted that these assessments were based upon the administrative construction recommended by the State Board of Equalization in an assessor's handbook and Attorney General's opinion. (See 57 Ops.Cal. Atty.Gen. 506, 516 (1974).)

Buddy Florence, senior auditor-appraiser for the State Board of Equalization, stated that nursery plants grown for resale are administratively treated as personal property falling outside the growing crop exemption. In the January 1974 assessor's handbook issued by the board, turf grass was characterized as nursery stock because it was in the taxable category of "plants that are cultivated and propagated for

[3]Under section 219, subdivision (a) (3), 50 percent of the assessed value of business inventories is exempt from taxation for the inclusive period between the 1974-1975 and 1979-1980 fiscal years. However, for fiscal years after 1979-1980, business inventories are completely exempt from taxation. (§ 219, subd. (a) (4).) In contrast, growing crops were completely exempt from taxation during the fiscal years in question. (See 57 Ops.Cal.Atty.Gen. 506, 520 (1974).)

sale."[4] In explaining why turf grass is regarded as nursery stock, Florence testified that the grass is grown for sale and transplanting "the same as rose cuttings of a rosegrower are grown for sale and transplanting." He noted that rose cuttings for sale have been treated as nursery stock by prior court decisions. Florence further indicated that turf grass is botanically a perennial and is grown as a perennial in California. He contrasted the grass with tomatoes, which is a perennial treated as an annual due to California weather conditions.[5] Nevertheless, Florence explained that chrysanthemums are one type of nursery stock regarded as growing crops; this is because the cut flowers are sold rather than the plant which produced the flowers. In fact, it was established that the plant is destroyed after the flowers have been severed. Florence concluded that turf grass is different from chrysanthemums, because the plant itself is sold for transplanting by customers. In contrast, only the cut flowers are saved from the chrysanthemum plant which is subsequently destroyed.

The parties stipulated that Nunes paid the $5,900 assessment on turf grass under protest and had received no reimbursement from the county. A declaration of an officer from the state Controller's office was admitted into evidence. The document related that the Controller informed all county auditors of his intention to not seek tax reimbursement for lost revenues because of the Attorney General's opinion stating that section 202.1 was invalid. (See 57 Ops.Cal.Atty.Gen 506, 516 (1974).)

The court concluded that Nunes was entitled to a tax refund and that section 202.1 was constitutional. In addition, it determined that Kern County was entitled to file a reimbursement claim for lost revenues against the state Controller.[6]

### THE STANISLAUS PROCEEDING

Mr. Nunes and Auditor Florence also testified at the Stanislaus hearing, duplicating most of their earlier statements.

---

[4] In the revised assessor's handbook issued in December 1974, nursery stock was defined as including (1) plants that are cultivated and propagated for sale, (2) plants that are cultivated and propagated to produce products which are sold, and (3) products of the producing plants. Turf grass was administratively interpreted as being in the first category.

[5] Specifically, Florence testified: "Well, the tomatoes that were discussed in earlier testimony, I treated as an auual [sic] in California because of the climatic conditions. The weather that we have in California will kill a tomato plant after it has reached the first frost."

[6] (See Stats. 1974, ch. 157, § 2(a), p. 303.)

Mr. Nunes stated that the implements used to prepare the land for turf grass planting are "identical to what I use in my farming operation." The bluegrass was sold to landscapers, developers, and homeowners for transplanting as lawn. Mr. Nunes indicated that "We will not harvest a square foot unless we have an order for it." He stated that the grass is harvested within one year because of economic necessity. In clarifying this justification for annual harvesting, Nunes indicated "but in our management, after being in the business for 15 years, as part of our management we plant at least 12 months out of the year and we try to project our sales and plant accordingly, so we don't have a lot of sod sitting there for several months." Nonetheless, it was admitted that the grass could be held indefinitely if properly maintained. Unless proper maintenance is undertaken, the turf grass can become infested with weeds and insects.

Florence reiterated the same testimony about the administrative interpretation given to turf grass by the State Board of Equalization. The crux of the administrative construction was revealed in the following line of questioning: "Q. You have here the testimony that turfgrass is as a matter of practice cut and removed for transplanting at least once each year. Is that in your opinion inconsistent with its characterization as nursery stock?

"A. No, it is not. There are other nursery stock items that are grown and sold within one year, but they're grown and sold as living plants.

"Q. I take it that the crucial consideration for you, then, is that the sale of the plant is a living plant?

"A. That is part of our conclusion, yes. That's what we rested on." He also noted that most counties throughout California were assessing turf grass in 1973 and that only Ventura County exempted it as a growing crop. Florence said some perennials were treated as annuals because of climatic conditions or because the *product* of such plants was the salable item.

The parties stipulated that Nunes had paid $5,800.38 in taxes for turf grass in the fiscal year 1975-1976 and $3,423.04 in the fiscal year 1976-1977. They also agreed that Nunes protested payment of $5,771.23 and $3,423 for the respective fiscal tax years. The Stanislaus County Board of Supervisors denied the claims for refund.

The court denied relief to Nunes, ruling that section 202.1 was an invalid exercise of legislative authority under the California Constitution.[7]

■ Appellants Kern and state Controller contend that section 202.1 is invalid as an ultra vires attempt by the Legislature to include turf grass sold for transplanting within the "growing crop" exemption. Contradistinguished, appellant Nunes contends that the statutory provision is a valid legislative clarification of the status of turf grass. The resolution of this issue depends upon whether turf grass satisfies the definition of growing crop existing at the time the constitutional amendment was adopted. We do not believe it does.

## DISCUSSION

Since 1879, the California Constitution (former art. XIII, § 1) has exempted "growing crops" from taxation.[8] In 1974, the Legislature added section 202.1, which provides that: "For purposes of the exemption from taxation specified in Section 1 of Article XIII of the Constitution and Section 202, 'growing crops' includes turf grass which is cultivated and harvested for sale and transplanting."

■ We believe clearly established rules of constitutional interpretation require that a term used in a constitutional amendment must be construed according to the meaning it had when the amendment was adopted. The Legislature cannot *expand* the meaning of the amendment by subsequent legislation, since such an expansion would be equivalent to a constitutional amendment. (See *Forster Shipbldg. Co.* v.

[7]We note the findings of fact in each of the cases, among other things, declared that: "[a] These turf grasses on the real property of [Nunes] are plants that are sown, cultivated and harvested by [Nunes] solely for the purpose of sale to and transplanting by customers of [Nunes].

"[b] The planting and sowing and harvesting of the turf grasses by [Nunes] all occur within a one year period as necessitated and required by the economics and commercial necessities of the production of such turf grass and as also required to control damage to and loss of quality of such turf grasses due to disease and noxious weed infestations.

"[c] Neither the botanical nature nor climatic conditions require turf grasses to be annually sown or planted.

"[d] Neither the botanical nature nor climatic conditions require turf grasses to be annually harvested.

"[e] The turf grasses grown by [Nunes] are held in the ground awaiting orders from customers, and upon such order are harvested.

"[f] Subsequent to harvesting the turf grass, [Nunes] plants a new crop of turf grass from seed, which is in turn harvested within a one year period.

"[g] Turf grasses grown for sale and transplanting by Nunes Turfgrass are botanically classified as perennials."

[8]The exemption is presently found in article XIII, section 3, subdivision (h), which states: "The following are exempt from property taxation:... (h) Growing crops."

*County of L.A.* (1960) 54 Cal.2d 450, 456 [6 Cal.Rptr. 24, 353 P.2d 736]; *Stribling's Nurseries, Inc.* v. *County of Merced* (1965) 232 Cal. App.2d 759, 762 [43 Cal.Rptr. 211].) Although the Legislature can clarify constitutional amendments of doubtful or obscure meaning (*Delaney* v. *Lowery* (1944) 25 Cal.2d 561, 569 [154 P.2d 674]), it cannot transcend the meaning intended by the constitutional framers.

▬ The exemption in article XIII, section 3, subdivision (h), of the Constitution was apparently spurred by the concern that assessment of growing crops might discourage planting and sowing. (See Stimson, *Exemption From the Property Tax in California* (1933) 21 Cal.L.Rev. 193, 206.) The meaning of "growing crops" under the constitutional exemption has been elucidated by a series of judicial precedents. Before deciding whether turf grass satisfies the constitutional definition, it is necessary to examine cases which are helpful in delineating the scope of a "growing crop."

The seminal test of the constitutional term "growing crop" was enunciated in *Cottle* v. *Spitzer* (1884) 65 Cal. 456 [4 P. 435]. Our Supreme Court decided that fruit trees were not within the definition of growing crop contained in former article XIII, section 1, of the Constitution. (*Cottle, supra*, at pp. 460, 464-465.) In so doing, the meaning of "growing crop" was clarified by the high court, which adopted the reasoning of Superior Court Judges Spencer and Belden. In Judge Spencer's opinion, "...it is at least doubtful if, under the common and restrictive acceptation of the term, anything more would be understood than products from annual plants, as cereals, maize, etc.,..." (*Id.*, at pp. 457-458.) He also stated that "...in relation to the single term of 'growing crops,' my conclusion is that it is in effect a declaration that it is not sufficiently tangible to be treated as property; it is in a transitory state, starting with the embryo and ending with the matured product, at no two consecutive points of time in the same condition. To attempt to place upon it any money value, would be to indulge in the merest guesswork." (*Id.*, at p. 460.) Judge Belden's opinion contains the "growing crop" definition most frequently cited in subsequent precedents. He said that the term ""*includes only those crops which require an annual planting or sowing, or an annual harvesting.*"" (*Id.*, at p. 463.)[9] Judge Belden showed that this definition was the one prevailing at the time of the Constitution by penning that: "The members of this [constitutional]

---

[9]For two other states which have also adopted the "annual requirement" definition for growing crop see *Miethke* v. *Pierce County* (1933) 173 Wash. 381 [23 P.2d 405]; *Kuehn* v. *City of Antigo* (1909) 139 Wis. 132 [120 N.W. 823].

convention could but have been aware of the growing importance of the vine and fruit interest of the State. It was reported to them that fifty millions of capital was then employed in grape culture alone, and yet in all the debates upon this question, both upon the part of those who favored, and by those who opposed this exemption, *constant reference is made to a crop to be sown and harvested within the same year, and not even a suggestion that trees or vines of perennial growth were referred to.*" (*Cottle* v. *Spitzer, supra*, 65 Cal. at p. 463, italics added.) The Supreme Court also cited language from both judges which indicated that such tax exemptions should be construed narrowly. (*Cottle, supra*, at pp. 459-460, 464-465.)

In *Miller* v. *County of Kern* (1902) 137 Cal. 516 [70 P. 549 (second appeal 1907, 150 Cal. 797 [90 P. 119]), the Supreme Court determined that alfalfa was not within the "growing crop" exemption. The court reasoned that alfalfa is a perennial plant which, when properly maintained, produces annual hay crops for an indefinite number of years. (*Id.*, 137 Cal. at pp. 524-525.) Relying upon *Cottle*, it was decided that alfalfa was not a growing crop: "As a hay crop, it is unlike wheat or barley, sown for hay, which produces but a single annual crop and no more." (*Id.*, at p. 525.)[10]

Whether nursery stock for sale constituted a crop was considered by our high court in *Story* v. *Christin* (1939) 14 Cal.2d 592 [95 P.2d 925, 125 A.L.R. 1402], a case not directly concerned with the constitutional exemption. The plaintiff in *Story* defaulted on a lease agreement and, following dispossession, initiated a conversion action against the lessor for recovery of orange and walnut trees grown as nursery stock on the leased land. The trees were planted closely together in rows, were usually purchased through contracts for future delivery, and were sold for the purpose of planting in orchards. (*Id.*, at pp. 593-594.) Plaintiff claimed that the trees were personal property and stock in trade for sale to the public in his nursery business; defendant lessor suggested that the trees were a growing crop properly regarded as realty. The superior court dismissed the conversion action for failure to state a claim, and the appellate court reversed. In overturning the lower court, *Story* held

---

[10]*Miller* was subsequently utilized to sustain the conclusion that natural grasses used for grazing forage did not constitute a growing crop. (*El Tejon Cattle Co.* v. *County of San Diego* (1966) 64 Cal.2d 428, 431 [50 Cal.Rptr. 546, 413 P.2d 136].) The Supreme Court in *El Tejon Cattle* stated, "...'natural grasses,' does not require annual or seasonal planting; it may therefore be appropriately likened to alfalfa, a perennial plant considered in *Miller*...and held not to fall within the constitutional exemption." (*Id.*, at p. 431.)

that nursery trees more closely resembled stock in trade than a crop which *requires* annual sowing and harvesting. The court noted: "There is no annual sowing and reaping, the purpose of planting being that they may later be transplanted. Such trees are attached to the soil by roots because only in this manner may they be kept ready for sale." (*Id.*, at p. 595.) Instead, it was found that the fruit and nut trees were personalty because of commercial realities—they were grown for resale to the public and severed in accordance with buyers' needs. Attachment to the land was considered inconsequential by the court, which observed that: "Nursery trees are attached to the land by their roots because, under the law of agriculture they must get their nourishment from the land. The ground is the only feasible storage place for this salable product and soil serves the dual purpose of maturing and preserving *until a buyer is found for them.*" (*Id.*, at p. 596, italics added.) Based on these considerations, the Supreme Court established that nursery stock for sale was not equivalent to a growing crop.

Further exploration of the correct classification of nursery stock was undertaken in *Jackson & Perkins Co.* v. *Stanislaus County Board of Supervisors* (1959) 168 Cal.App.2d 559 [335 P.2d 976]. Plaintiff corporation grew rose bushes and other plants for sale as nursery articles. The ground was leveled, subsoiled, and planted to rose cuttings taken from wild stock. The developing plants were irrigated and weeded, and then budded to the desired types of roses. Testimony established that it takes one to two years to complete the plants to the point where they are salable; one year for plants intended to be used for their cut flowers and two years for plants intended for open air planting. It was also shown that the plants became commercially valueless after these time periods, that they are not grown for the profit from the *products* of the plant, and that they require maintenance with farm-type procedures. (*Id.*, at pp. 559-560.) The appellate court held that *both the one- and two-year* rose bushes raised by plaintiff were not entitled to the "growing crop" exemption. Relying upon *Story*, the court initially found that the nursery stock had the characteristics of personalty taxed as stock in trade. (*Id.*, at p. 563.) Moreover, it also relied upon the Washington case of *Miethke* v. *Pierce County, supra*, 173 Wash. 381, which ruled that nursery stock sold for transplanting by customers did not constitute a growing crop. (*Jackson & Perkins Co.* v. *Stanislaus County Board of Supervisors, supra*, 168 Cal.App.2d at pp. 563-564.) Finally, the court noted that its characterization accorded with the administrative interpretation given to nursery stock since 1948. (*Id.*, at p. 564.)

In *Stribling's Nurseries, Inc.* v. *County of Merced, supra*, 232 Cal. App.2d 759, this court similarly addressed the proper classification of nursery stock in relation to the growing crop exemption. We initially determined that the *Cottle* definition is the correct meaning of "growing crop" as that term is used under former article XIII, section 1 of the California Constitution. (*Stribling's Nurseries, Inc., supra*, at p. 762.) This court then stated: "We find no case overruling either *Cottle* or *Jackson & Perkins.* Therefore *the language 'growing crops' in article XIII, section 1, of the Constitution does not include growing nursery stock unless it meets the Cottle test of annual planting or sowing or an annual harvesting.* In this case, plaintiff [nursery] has not contended that nursery stock meets this requirement." (*Ibid.*, italics added.) Based upon the fact that nursery stock did not constitute a growing crop, this court invalidated a statute attempting to impermissibly exempt such plants from taxation. (*Id.*, at p. 763.)

In the case before us, we are called upon to address the question not examined in *Stribling's Nurseries*—whether turf grass satisfies the *Cottle* definition or more closely resembles taxable nursery stock. We are of the opinion that turf grass falls outside the "growing crop" exemption for the following reasons.

First, turf grass has *no requirement* that it be annually planted or harvested.[11] Uncontradicted testimony established that Nunes' bluegrass is a perennial. Nonetheless, the grass is harvested within one year because of *economic and management practice.* Although susceptibility to insects and weeds increases with time, Mr. Nunes conceded that grass can be maintained indefinitely if cared for in the proper manner. The annual harvesting is dictated by Nunes' attempt to manage production around the orders of its customers. These circumstances do not amount to the annual requirement specified in the decisional law.

At the request of the executive secretary of the State Board of Equalization, the annual requirement test was extensively discussed in a 1974 Attorney General's opinion. (See 57 Ops.Cal.Atty.Gen. 506 (1974).) This opinion analyzed the interrelationship between industry practice and annual planting/harvesting in the following manner: "It has been stated in the Assessors' Handbook AH 567, at page 2, that

---

[11]We note that both courts found that neither the botanical nature nor climatic conditions required turf grasses to be annually sown, planted, or harvested.

'when, as an industry practice, a perennial plant is removed annually following the harvest of its crop, the plant should be exempted along with the crop.' *This view would appear to be correct to the extent that the industry practice demonstrates the necessity for an annual planting or sowing, or an annual harvesting.* Where a particular specie of plant must be treated as an annual by California farmers *because of climatic conditions or the physical characteristics of the plant itself,* we are of the view that it is a 'growing crop' while growing on the grower's lands even though such plant is technically classified botanically as a perennial. For example, tomato vines are classified botanically as perennials and are so treated in other countries, but are regarded as annuals in California because of climatic conditions. Tomatoes are planted or sown annually and are destroyed at the end of the growing season since they do not last beyond the first hard frost in the fall. Moreover, such plants are usually physically spent after one season and must be destroyed in order that a new crop may be planted the following year. *This reasoning does not apply, however, to plants which are not grown for harvesting at all but are grown for sale by nurseries as living plants for transplanting.* Nor would it apply to perennial plants not grown for sale as living plants which are for convenience or economic reasons destroyed at the end of the season. The fact that there may be an industry practice to destroy the remaining plants and root stock, either because they were not seasonably sold or because the grower can more profitably start new plants from bulbs, seeds, or cuttings, which plants will be sold during the following year, would not serve to make the plants 'growing crops' within the meaning of the Constitution. This is particularly true where there is no element of harvesting, or the plants are personal property held for sale as living plants, . . ., or there is no necessity for destroying the plant other than the fact that it is no longer readily salable. *In other words, just because the nursery industry finds it convenient or profitable to destroy a perennial plant at the end of the growing season does not mean that they have met the Cottle v. Spitzer test.*

"This is not to say that the consistent practice of the California agricultural industry as a whole should not be examined in a particular case. Such practice may evidence the fact that a particular specie of plant *must be treated as an annual because of its nature or because the environment requires an annual planting, sowing, or harvesting.* If this is so, such plant should be exempted as a 'growing crop' while growing on the grower's lands even though it may be botanically classified as a perennial." (*Id.,* at pp. 506, 512 (1974), italics added.) Although we are

not bound by this interpretation—which treats perennials as annuals if *climatic conditions* or *physical characteristics of the plant* so mandate —we are of the view that it coincides with judicial guidelines. Both rationales adopted in *Cottle* expressed the opinion that perennial plants were probably not contemplated to be growing crops. As in *Miller*, turf grass resembles alfalfa which, under proper maintenance, can survive indefinitely. The grass is "harvested" annually because of managerial practice and carefully planned economic production, even though it is a perennial capable of longer growth. The Attorney General's opinion makes a rational demarcation—perennials should be classified as annuals only due to climatic or physical limitations. Turf grass does not *require* annual sowing or harvesting for either of these reasons. Although classification does not revolve solely upon the plant's botanical status, we do not believe economic demand and management techniques should dispositively determine satisfaction of the "annual requirement" test.

Nunes contends that turf grass' eligibility as a growing crop should be based upon the fact it is grown and harvested with the aid of conventional farm practices. In our view this circumstance is not determinative. The rose bushes in *Jackson & Perkins* were harvested by a tractor-like machine and still found to be personalty for taxation purposes. Further, turf grass is more accurately gathered so that the *entire plant* can be subsequently transplanted rather than harvested for *its product* (as with a crop of grain, grass, or *cut* flowers). (See *Cottle v. Spitzer, supra*, 65 Cal. at p. 462 (opn. of J. Belden) (crop is ""that which in ordinary husbandry was to be severed from the land when utilized""); 57 Ops.Cal.Atty.Gen. 506, 513 (1974) ("'Harvesting is the time when crops of grain or grass are gathered, also the gathering of crops of any kind.'")) Thus, "harvesting" techniques are not dispositive of the classification of turf grass, since it must of biological necessity be attached to the land for nourishment. (Cf. *Story v. Christin, supra*, 14 Cal.2d at pp. 595-596.)[12]

---

[12]It is noteworthy that the State Board of Equalization treats perennial plants grown for their *products* (rather than for their *entire plant*) as annuals for the "growing crop" exemption. For example, the board has stated: "The chrysanthemum is grown as a perennial plant in the home garden. However, in commercial cut-flower operations, the chrysanthemum is treated as an annual plant. The rooted cuttings mature in 12 to 14 weeks, *at which time flowers are harvested and the plant is discarded.* Chrysanthemums grown for cut-flower production in this manner qualify as exempt 'growing crops,' i.e., both the unsevered flowers and the producing plants are exempt." (Cal. State Board of Equalization, Assessor's Handbook, Assessment of Nursery Stock, AH 567 (Jan. 1974) p. 12, italics added; see also 57 Ops.Cal.Atty.Gen. 506, 514 (1974).)

Second, turf grass is not a growing crop because of its similarity to nursery stock in trade which is taxable as personal property. *Story, Jackson & Perkins*, and *Stribling's Nurseries* stand for the proposition that nursery stock sold for subsequent transplanting does not constitute a growing crop. *Story* reasoned that the attachment of nursery plants to the land was inconsequential in light of the purpose to sell the stock to buyers. (*Story v. Christin, supra*, 14 Cal.2d at p. 596.) In *Jackson & Perkins*, both one- and two-year rose bushes grown as nursery stock were deemed to be personalty falling outside the growing crop exemption. (*Jackson & Perkins Co. v. Stanislaus County Board of Supervisors, supra*, 168 Cal.App.2d at pp. 559-560, 563.) Finally, *Stribling's Nurseries* articulated that nursery plants were not growing crops unless they satisfied the *Cottle* definition. (*Stribling's Nurseries, Inc.* v. *County of Merced, supra*, 232 Cal.App.2d at p. 762.) Mr. Nunes clearly testified that his bluegrass is sold for ultimate transplanting by customers who desire lawns. In fact, sowing and harvesting practices are centered around the demand of customers. Since only management practices dictate annual harvesting, the grass is in the same position as the nursery stock taxed as personalty under the case law.

This result is also supported by the conclusion from the 1974 Attorney General's opinion. After observing that turf grass is a perennial and gathered with its roots intact, the opinion noted: "While there is a shade of distinction between nursery plants grown by nurseries for sale and transplanting and turf grass which is grown for sale and transplanting, the distinction is in law without a difference. *A turf grower is simply another kind of nursery grower.* This is a relatively new industry, but...[there is] no legal difference between a turf grower and a nursery grower." (57 Ops.Cal.Atty.Gen. 506, 516 (1974), italics added.) As we have indicated, although the Attorney General's opinion is not binding on this court, its analysis is cogent and applicable. We believe that turf growers more closely resemble merchants than farmers for taxation purposes; thus, they are not entitled to the benefit of the growing crop exemption.

Nunes then contends that the annual requirement is met because there is a yearly destruction of the root stock at harvesting. This argument is likewise answered by the Attorney General's opinion, which indicated that: "...the annual destruction of the root stock of perennial grasses by the turf grass farmer is not the deciding factor in determining whether the plant is an annual or a perennial....turf grass is a perennial, both in the hands of the grower and in the hands of his cus-

tomer who buys it and transplants it to make a lawn. Indeed, if the purchaser of turf grass were to find that his lawn was an annual when he expected to have a permanent lawn, his disappointment would be great." (*Id.*, at p. 517.)

Nunes finally contends that our decision in *Stribling's Nurseries* compels a recognition that some types of nursery stock (such as turf grass) can satisfy the *Cottle* test. While this court did indicate language to this effect, such dictum must be read carefully. The 1974 Attorney General's opinion did just that in the following passage: "*The language of the Stribling's Nurseries case cannot be extended by implication to exempt nursery plants which are grown for sale, in view of the holding that they are not crops in Jackson & Perkins Co.* v. *Stanislaus County Board of Supervisors, supra,* 168 Cal.App.2d 559 . . . [this does not] imply that a growing crop can never be personal property in the hands of the grower . . . when nursery plants are in the hands of the grower, held for sale by him for transplanting as living plants, they are not growing crops but are personal property which falls outside the 'growing crops' exemption. Indeed, as personal property these plants become subject to the business inventory exemption (§§ 129 and 219, Rev. & Tax. Code . . .). While it has been argued that nurserymen are subject to many of the same problems as ordinary farmers, i.e., plant diseases, blights, droughts, etc., . . . *there is a reasonable basis for different classifications between them where the business of a nursery is raising the plants for sale, whereas the business of farmers and other growers is to plant, raise, and harvest the crops produced from the plants . . . it is for this reason that section 219 includes the stock in trade of nurserymen as 'business inventories,' whereas there is no reason to further exempt growing crops in the hands of the farmer since they are not taxable at all prior to harvest.*" (*Id.*, at p. 515, italics added.) In *Stribling's Nurseries*, this court noted that *Jackson & Perkins* had continuing viability. We believe that the Attorney General's opinion correctly interprets our prior decision and points out justification for treating turf growers as merchants and that its analysis shows why Nunes' bluegrass should be treated as nursery stock.

Appellant state Controller and respondent Stanislaus finally contend that turf grass is not a "growing crop" because it has an ascertainable value on any given lien date (i.e., sales price set by the nurseryman or grower). These parties apparently rely upon Judge Spencer's opinion in *Cottle*, which suggests that a growing crop "is not sufficiently tangible

to be treated as property...." (*Cottle* v. *Spitzer, supra,* 65 Cal. 456, 460.) We do not believe the "ascertainable value" language is the proper standard for determining a growing crop under *Cottle.* Decisional law has established that the annual requirement test is the definition given imprimatur in *Cottle.* Moreover, if this were a prong of the test, turf grass might qualify in light of its intangible nature during maturation. Since most plants are somewhat intangible during their growth, we do not believe this to be the distinguishing factor in the legal definition of a "growing crop."

Although courts will attempt to sustain clarifying legislation, we conclude that section 202.1 attempts to inject a category of growth which is beyond that intended by the constitutional language in article XIII, section 3, subdivision (h). Turf grass does not satisfy the *Cottle* test and is remarkably similar to nursery stock falling outside the growing crop exemption.[13] For these reasons, we find section 202.1 invalid as an excessive exercise of legislative authority.

The judgments in 5 Civil No. 4242 against defendant Kern and cross-defendant Kenneth Cory, Controller of the State of California, are reversed.

The judgment in 5 Civil No. 4410 against Nunes is affirmed.

Hanson (P. D.), J., and Conn, J.,* concurred.

On December 3, 1980, the opinion was modified to read as printed above.

---

[13]As noted earlier, all counties but Ventura have deemed turf grass to be taxable as personal property and as falling outside the growing crop exemption. The administrative treatment of turf grass adopted by the counties herein is entitled to great weight. (*Stribling's Nurseries, Inc.* v. *County of Merced, supra,* 232 Cal.App.2d at p. 763.) Since it was not an erroneous interpretation, there is no reason to not adhere to the administrative classification of turf grass as personal property.

*Assigned by the Chairperson of the Judicial Council.